CHARLES F. CLARK, A Minor, by ROY C. CLARK, His Next Friend, v. ATCHISON & EASTERN BRIDGE COMPANY, Appellant.—24 S. W. (2d) 143.

Division One, February 3, 1930.

*Stringfellow & Garvey* and *W. F. Guthrie* for appellant.

*Miles Elliott* and *Duvall & Boyd* for respondent.

SEDDON, C.—Plaintiff, a minor, brought this action by next friend to recover damages in the sum of $50,000 for personal injuries alleged to have been caused and suffered on or about April 3, 1925, by reason of the negligence of defendant corporation, which owns, operates and maintains a toll bridge across the Missouri River, extending between the city of Atchison, in the State of Kansas, and the town of Winthrop, or East Atchison, in the State of Missouri. The bridge in question is used for railroad, pedestrian and vehicular traffic, and a single railroad track extends along and across such bridge, which track is used by several railroad carriers. A trial and submission of the action to a jury resulted in the return of a verdict, signed by ten jurors, wherein the finding of the jury was for the defendant, and against the plaintiff. A motion for a new trial was duly filed by plaintiff, and upon argument and submission thereof to the trial court, the motion was sustained by the court upon the specified ground of error in the giving of four certain instructions to the jury at the request of defendant. From the order of the trial court sustaining such motion and granting a new trial of the action, the defendant was allowed an appeal to this court.

The action was brought against the Bridge Company and four named railroad corporations, as co-defendants, but was dismissed as to the four railroad corporations prior to the trial and submission of the action. The petition charges the defendant Bridge Company with negligence in the following particulars:

"That, at all the times herein mentioned, it was the duty of defendant(s) to maintain and keep the said bridge and the floor and vehicle track thereof in a reasonably safe condition for vehicle traffic, including motor vehicle traffic; that on or about the third day of April, 1925, and for a long time prior thereto, defendant(s) negligently caused, permitted and allowed the floor and the surface of the floor of said bridge, near the east end thereof, to become and be and remain in a defective, unsafe and dangerous condition for vehicle traffic and travel; that defendant(s) then and there, and for a long time prior thereto, negligently maintained the rails of the railroad tracks crossing said bridge, and negligently permitted and allowed same to be and remain, higher than the floor of said bridge, and negligently allowed and permitted the tops of said rails to stand and extend above the surface of the floor of said bridge and negligently caused, permitted and allowed the floor of said bridge to then and there become and be and remain in such condition that when heavy vehicles passed over said floor the said floor and boards or planks thereof were caused to give down and to sink, so that the tops of said rails extended a great distance above the surface of said floor; that defendant(s) then and there negligently permitted and allowed the boards along and by and on the south side of the north rail of said railroad track to become and be and remain in such a worn and defective condition that a rut or groove was caused and permitted to be and remain along and on the south side of said north rail of said railroad track; that on account of the condition of said rail and said floor and the surface thereof and said groove or rut along and by the said rail, the said bridge of defendant(s) was then and there rendered unsafe and dangerous for vehicle traffic and travel."

The answer of defendant Bridge Company is a general denial, coupled with a plea of contributory negligence on the part of plaintiff, as follows:

"Further answering, defendant states that when plaintiff approached the place of said accident, the plaintiff failed to give his attention to the driving of said truck at a time and place where it was well known to plaintiff that a turn was required; that plaintiff at the time of the accident complained of was driving a truck at a high and dangerous rate of speed and at a rate of speed in excess of the legal speed-limit under the existing conditions, and was driving said truck at said high and dangerous rate of speed at a time and

place where and when the roadway was moist and wet from rain and mist, with no safety chains in use; that said plaintiff was driving and endeavoring to control said truck from a seat reasonably sufficient in size for two persons only, but that plaintiff had invited three guests and had said seat at said time occupied by four persons; that said seat was so small that with this number of occupants plaintiff was so cramped as to make it impossible to have reasonable control of his movements and of the truck; that while traveling at such high and dangerous rate of speed, plaintiff suddenly applied the brakes and held same applied, thereby causing the truck to skid, travel sideways and overturn, and held same applied until said truck was overturned; that at a point where a turn was required, plaintiff failed to guide and turn the truck at such an angle and at such a rate of speed as the obvious condition of the roadway required; that plaintiff's negligent conduct, as above stated, directly contributed to the accident and injury complained of.''

No reply is shown by the record to have been filed by plaintiff, but the cause was tried and submitted as though a reply, consisting of a general denial of the averments of the answer, had been filed.

It is uncontroverted upon the record herein that the corporate defendant, the Atchison and Eastern Bridge Company, on April 3, 1925, and for many years prior thereto, was the owner and operator of the toll bridge in question, and was chargeable with the proper maintenance of such bridge. The bridge extends in a general easterly and westerly direction across the Missouri River, the western terminus being in Atchison, Kansas, and the eastern terminus being in Winthrop, or East Atchison, Missouri. It consists of a steel superstructure (referred to in the record as the "bridge proper"), and two approaches, one at each end of the superstructure. Along the middle of the superstructure of the bridge was a single, standard-gauge railroad track, 4.7 feet wide, which was used by four railroad companies. The width of the superstructure, between the truss members of the bridge, is 14.3 feet, and the width of the vehicular and pedestrian roadway on each side of the railroad track is 4.8 feet, so that there is not room for a railroad train and vehicles both to pass over the superstructure of the bridge at the same time; that is to say, eastbound vehicles straddle the south rail of the railroad track in order to pass westbound vehicles, which straddle the north rail of the railroad track. The approach at the east end, or Missouri side, of the bridge is 61.2 to 61.7 feet in length, according to actual measurements made by civil engineers on behalf of the respective parties. On and along the south side of the east approach is a gravel roadway approximately five feet wide, which roadway seemingly is more used by pedestrians than by vehicles. On and along the north side of the east approach is a concrete vehicular roadway.

triangular in shape, the base of which triangle is the north rail of the railroad track. The concrete roadway varies in width from 4.8 feet at the west end of the approach to 18.2 feet at the east end of the approach. The space between the rails of the railroad track, and 1.8 feet outside of the north rail, was planked, or paved, with heavy wooden boards, each of which planks, or boards, was approximately three and one-half inches in thickness, eight inches wide, and from twelve to sixteen feet in length. The measurements of the width of the concrete roadway on the north side of the east approach include the 1.8 feet of planking on the outside of the north rail of the railroad track. At a point 25.7 feet east of the west end of the east approach, or distant from the east end of the superstructure of the bridge, was a joint in the north rail of the railroad track, at which joint two lengths of the north rail of the railroad track were fastened together by bolts and fish-plates. Plaintiff's evidence tended to show that the ball, or top, of the north rail of the railroad track, at such joint, and for a distance of several feet on either side of such joint, was from two to four inches higher than the tops of the planks between the rails of the railroad track. A plat offered in evidence by plaintiff, and a similar plat offered by defendant, show only a single joint in the north rail of the railroad track within the entire length of the east approach of the bridge, except that defendant's plat shows a second joint in the north rail located at approximately the east end of the approach. Plaintiff's evidence further tended to show that there was a groove, approximately three to four inches in width, between the rail joint and the planking adjacent to, and immediately south of, the north rail of the railroad track, the purpose of which groove was to provide space or room for the flanges of the railroad car wheels, and also to permit the use of tools in tightening the bolts which held the fish-plates in place at the rail joint; that the planking between the rails of the railroad track in the vicinity of the rail joint was somewhat worn by the vehicular traffic; that the planking near the rail joint was not solid or firm, but would be depressed, or would give down, from one-half inch to two inches, as automobiles, and other vehicles, passed over it at that point; and that the rail joint was located approximately at a point where most of the vehicular traffic, traveling in both directions, crossed the north rail of the railroad track. A public highway extended in an easterly direction from the east end of the concrete roadway of the east approach of the bridge, such highway extending parallel with, and lying on the north side of, the railroad track. The public highway was paved with gravel or macadam, and extended to the city of St. Joseph. At the northeast corner of the concrete roadway of the east approach of the bridge was located a toll-house, or watchman's house (called a "shanty" in the record).

The east side of the toll-house is coincident with the extension of a line marking the east end of the concrete roadway of the east approach of the bridge, and the west end of the graveled or macadamed public highway. About thirty or thirty-five feet east of the east end of the concrete roadway, a small road turns to the north, leading from the north side of the graveled public highway. At a point coincident with the line (extended south) between the concrete roadway and the graveled public highway, the defendant maintained a portable or moveable "stop" sign, supported by a light wooden frame, or standard, which was placed between the rails of the railroad track, when the railroad track was not in use. Such "stop" sign served as a warning to drivers of eastbound vehicles not to continue straight eastwardly along the railroad track, but to turn to the left, cross the railroad track, and enter the concrete roadway, and thence travel eastwardly along the concrete roadway, and thence onto the graveled public highway. The foregoing is a sufficient description of the immediate surroundings where plaintiff's injury occurred; that is to say, the *locus in quo*.

Plaintiff was eighteen years of age at the time of his injury. He was then employed, and had been so employed for several months prior thereto, as a truck-driver by the Atchison Poultry & Supply Company. As a part of the duties of his employment, plaintiff made frequent trips, from one to three times each week, between Atchison, Kansas, and St. Joseph, Missouri, for the purpose of hauling sacks of feed from certain mills in St. Joseph to the place of business of his employer in Atchison. On the morning of April 3, 1925, between eight and nine o'clock, plaintiff left Atchison for the purpose of going to St. Joseph to get a truck load of feed for his employer. He was driving a three-fourths-ton automobile truck, known as an "International Speed Wagon," consisting of an open truck body having an enclosed canopy, or cab, on the front end of the body, over the driver's seat, which was approximately four feet in width. Plaintiff was accompanied on the trip by his sister, and by a young man and a young woman, who were friends of plaintiff and his sister. All of the occupants of the automobile truck were about of the same age, and all of them rode with plaintiff in the driver's seat of the truck. We infer from the testimony of plaintiff's sister that her girl friend sat upon the lap of the boy friend of plaintiff, and that the other three occupants were seated upon the driver's seat of the automobile truck. There had been a rain or mist on that morning, and the pavement of the superstructure, and of the roadway of the east approach of the bridge, and the rails of the railroad track, were damp or wet. According to the personal testimony of plaintiff, the automobile truck had been traveling eastwardly across the superstructure of the bridge at a speed of about ten or twelve miles an

hour, the truck straddling the south rail of the railroad track. Upon reaching the west end of the east approach, plaintiff started to turn the truck toward the left so as to "angle" northeastwardly across the north rail of the railroad track onto the concrete roadway of the east approach, and toward the graveled public highway. Plaintiff testified that the front wheels of the automobile truck "crossed the north rail all right," but that the left rear wheel of the truck caught on the north rail of the railroad track, at a point "a little west, I should judge about five feet probably," from the first, or west, joint in the north rail of the railroad track, and skidded down the north rail of the railroad track until the automobile truck was overturned. The testimony of some of plaintiff's witnesses (which testimony appellant strenuously insists is wholly unsubstantial in character and effect) tends to corroborate the testimony of plaintiff as to the manner and cause of the occurrence. We will discuss, and quote from, such testimony in the course of our opinion.

The evidence on behalf of the defendant-appellant tends to show that the automobile truck, as it crossed the superstructure of the bridge, was making a "roaring sound," as though the exhaust, or cut-out, pipe of the automobile were open; that several witnesses had examined the plank flooring of the superstructure, and of the east approach, of the bridge, shortly after the overturning of the truck, and found fresh "skid marks" thereon, indicating that the skidding of the wheels of the truck had commenced while the truck was on the superstructure of the bridge, and before the truck had reached the west end of the east approach; that such "skid marks" were found and located midway between the rails of the railroad track, and that the "skid marks" were not at any point adjacent to, and "did not touch," the north rail of the railroad track; that the "skid marks" continued to show the entire length of the east approach, and showed for a distance, variously estimated by defendant's witnesses as from ten to fifteen feet, beyond the east end of the approach and between the rails, and along the ties, of the railroad track; that the overturned truck was found lying upon its left side on the north side of the graveled public highway, and at a distance of thirty to forty feet east of the east end of the concrete roadway of the approach; that the overturned truck was found lying east of the small road leading to the north from the graveled public highway; that the portable "stop" sign standing at the east end of the approach, between the rails of the railroad track, was broken into several pieces by the impact of the automobile truck, and that broken pieces of the "stop" sign were found at distances of thirty-five to sixty-seven feet east and south of the east end of the approach. One of defendant's witnesses (he being the only witness for defendant who testified to having seen the automobile truck prior to its over-

turning) was asked how fast the automobile truck was coming across the superstructure of the bridge at the time he saw it, and the witness answered the inquiry by saying: "I don't suppose it was coming less than thirty miles an hour."

I. The order allowing and granting a new trial specifies of record, as the grounds on which a new trial is granted, error in the giving of instructions numbered 10, 13, 20 and 22, on behalf, and at the request, of defendant. While appellant insists that no error was committed by the trial court in the giving of said instructions, or any of them, appellant contends further that, whether or not the said instructions are deemed to be right or wrong, nevertheless, under all of the evidence in the cause, the verdict of the jury was for the right party, and the trial court should have peremptorily directed a finding and verdict for the defendant. If appellant is right in such contention, then it becomes unnecessary for us to consider, or to pass upon, the question of error in the giving of said instructions. We will, therefore, first consider and rule the contention of appellant that it was entitled to a directed verdict in its favor under all the evidence in the cause.

Appellant, in its brief filed in this court, concedes (with commendable, though perhaps necessary, frankness) that there is substantial evidence in the record upon which to submit to a jury for determination, as a controverted issue of fact, the question of defendant's negligence in the maintenance of the roadway of the east approach of the bridge. We quote such concession, as stated in appellant's brief: "Defendant-appellant concedes that there was sufficient evidence to take to the jury the issue as to whether this (north) rail (of the railroad track) extended above the planking higher than was justified in the exercise of ordinary care, thereby making a fair issue as to the *primary* negligence of appellant. . . . This was an issue upon which there was evidence supporting submission; and we do not contend that plaintiff did not prove that there was negligently present a condition which *might* have caused the accident. . . . We concede, for the purpose of consideration by this court, that there was evidence from which a jury might have found, were it so disposed, that appellant had not used ordinary care in the maintenance of its roadway." In view of such concession by appellant, which is amply supported by the evidence adduced on the trial of the cause, it is unnecessary to review or consider further the evidence bearing upon the alleged negligence of defendant in the maintenance of the roadway of the east approach of the bridge.

554

But appellant contends that the trial court should have peremptorily directed a verdict for defendant upon either of two grounds: (1) That there is no sufficiently probative, or substantial, evidence that the condition of the roadway of the east approach, at or near the joint of the north rail of the railroad track, had anything to do with the accident; that is to say, that there is no substantial proof of causal connection between the alleged defective and unsafe condition of the roadway of the east approach, at or near the rail-joint, and plaintiff's injury; and (2) that, even if such causal connection be deemed to have been established by substantial evidence, yet the contributory negligence of plaintiff, as a matter of law, is conclusively established by the physical facts alone, which could have resulted only from the driving, by plaintiff, of the automobile truck at a reckless speed, without attention to, or in wanton disregard of, the existing and present conditions.

The two contentions just stated require a quotation of part of the testimony of plaintiff, and certain of his witnesses, respecting what occurred immediately prior to plaintiff's injury, the cause of such occurrence, and the acts and conduct of plaintiff at the time of the occurrence.

Plaintiff testified, on direct examination: "Q. Just tell the jury, as you drove over the bridge, about how fast you were going. A. About ten or twelve miles an hour. Q. Tell them, in your own words, what happened to you as you drove over that east approach of that bridge. A. Well, as we came to the east approach of the bridge, we straddled the south rail crossing the bridge. I started to turn out and angled at the east approach. The front wheels crossed the north rail all right. The left rear wheel caught on the rail and skidded down the rail and turned over. Q. Can you indicate about where it was that the truck began to skid? A. It was close to the joint. Q. Close to the place marked 'joint' on the map? A. Yes, sir. Q. Which way from the joint? A. A little west. Q. About how far west of the joint, would you say? A. I should judge about five feet, probably. Q. You said the wheel skidded on the rail. Which rail? A. Left rear wheel. Q. Which rail? A. North rail. Q. Tell the jury what happened. A. Just skidded down the north rail and turned over. Q. Where did it turn over with reference to the east edge of the place marked 'concrete pavement' on the map? A. Why, I could not give a very certain answer on that. My judgment would be right east of the concrete approach, but that is as close as I could give. Q. Tell the jury what is the next thing you remember after you turned over. A. I just remember being taken home."

Cross-examination: "Q. And it was extra slippery there right at that turn, was it not, because of the dressing off the macadam or

gravel road—the wheels of the westbound cars would carry onto the concrete and boards? A. Well, it was wet. I do not know whether it was any more slippery there than somewhere else, or not. I do not remember crossing it when it was wet before. . . . Q. There has been some reference to (the automobile truck) sounding like the cut-out was wide open. Did it sound like that? A. It made a noise, yes. Q. Did it make a noise like a car running with the cut-out open? A. It had no cut-out on it. It had a similar noise, yes. . . . Q. Your tires on this car were about new at that time, were they not? A. Yes, pretty good tires. I think they were 35/5. Q. And a little smaller in front? A. Yes, sir. Q. But you had no chains on that morning? A. No, sir. Q. It was wet and raining when you started from Atchison, was it not? A. It was. . . . Q. Did you know that if you locked the wheels on a car it would be liable to skid even on a dry street? A. My judgment would be that it would. Q. Have you ever skidded before? A. Very little. Q. Well, how far was the worst skid you had ever had before? A. Well, I never took no measurements of it. My judgment would be two or three feet. I do not remember of skidding over that much. . . . Q. On this day of the accident, itself, did you actually have any observation of this particular rail joint? A. Well, I never thought anything about it. Q. On the day of the accident, then, you didn't notice the rail joint at the time of the accident? A. Oh, I might have saw it at a glance; I don't remember. Q. You have no recollection of seeing it? A. I don't remember. Q. Now, then, Charles, when you come before this jury and tell them about this joint having something to do with this accident, are you not testifying from what you have figured out since the accident might have been the cause of the accident, and not testifying from any recollection of what you saw or noticed that particular day? A. The reason that I know about this joint, it is where the main travel crosses, and that is where I crossed. Q. And the reason for that is that you have looked it up since, is it not? A. Well, I have noticed it being pretty close to the center of where the main travel travels. Q. You have noticed that since the accident, have you not? A. Yes; it is still there, I believe. Q. You didn't notice it before the accident, did you? A. I said I noticed it at a glance as I crossed over it. . . . Q. Now, Charles, wherever you, in fact, started to skid, and whatever your recollection may be today, it is a fact, is it not, that before you started to skid you applied your foot brake? A. Yes, sir. Q. And you had on that car a foot brake which would at once hold the tires nicely upon application, did you not? A. Yes, sir; it was a good foot brake. Q. From the time you applied the foot brake and the car started to skid, wherever it started to skid, you didn't release

that foot brake, but kept it applied until the car turned over and you were thrown off the truck? A. I don't know as I did that. Q. Did you, or did you not, release that brake after you applied it? A. I do not know. . . . Q. Now, on that day you didn't attempt to change your steering wheel, or the direction of your car, after you commenced to skid, did you? A. I do not know. Q. Do you not know that you did not? A. I know that I didn't try to turn it over. Q. Do you not know that you didn't try to straighten the car out and stop the skidding by any effort on your part? A. I don't know that I did not. Q. Is it not a fact, Charles, that as soon as that car began to skid, you expected that there was going to be an accident? A. Yes, when it skidded to amount to anything. Q. Didn't you just sit there without doing anything until the car turned over? A. Yes, I didn't get out. I guess I sat there. Q. Didn't you sit there without doing anything to try to save the situation? A. I don't know what I tried or not. Of course, I tried. . . . Q. Just as soon as that car began to skid that day, you became very much excited, did you not? A. Yes, I was excited. Q. Were you excited by the movement of the car that was going ten or twelve miles an hour? A. I was excited when the car started to skid; yes. . . . Q. From the time it started to skid, and you began to get excited, you hardly know what did happen, do you? A. Yes, I know it turned over. . : . Q. I do not want you to guess about it. I want you to testify from your recollection. Just remembering it in your head, not thinking about it afterwards, you do not know hardly anything that happened from the time you began to skid and got excited until they picked you up after the wreck, do you? A. Yes, I know it skidded. Q. You do not know any of the details, what happened, do you? A. Well, I do not know what other details there would be. Q. You do not know whether you hit the 'stop' sign or not? A. I do not. Q. You do not know whether the rear wheels went off the planking on the approach between the ties, and the car turned over after the rear end got beyond the approach itself, or not, do you? A. I do not. Q. You do not know how far you skidded altogether? A. No, sir. . . . Q. Now, Charles, from the time that the car started to skid that day, you expected to get hurt, did you not? A. I had an idea that I was not in any very soft place. Q. Didn't you expect to get hurt when that car started to skid, because you knew that car was going so fast it was liable to skid a long ways and hit something and turn over, or something of that kind? A. No, I did not know that. Q. Wasn't that car going so fast that, with your excitement, it happened so darn quickly you could not remember what happened in between the skidding and the turnover? A. No, it never went so fast as that. Q. Is it not a fact,

from the time that it began to skid, it turned over so quickly you do not know how far it skidded? A. No, I do not know exactly how far it skidded.''

Re-direct examination: ''Q. Mr. Guthrie asked you about applying the brakes. Just tell the jury how you applied the brakes. A. Well, I just applied them enough to make the slight turn—just slowed down enough to make the turn. Q. Did you apply them all at once, or gradually? A. Just gradually, just to make the angle. . . . Q. Do you know that these wheels were locked so that, at the very moment they turned over, the wheel was sliding sideways, and not turning? A. Yes, I know they were not locked.''

Mildred Clark, sister of plaintiff, testified: ''Q. Tell, in your own way, what happened just before the truck turned over, and until the truck turned over. A. Just as we were crossing the track, and went to turn, the front wheels went off the track, and the left back wheel got caught on the rail, and as it hit the place where it is fastened together, it slid on down and hit the 'stop' sign and turned over, and that is about all I remember; it happened so quickly, and was all over in a minute. Q. How do you know it was the left hind wheel that hit the rail? A. The left one hit the track first. Q. How did you know it began to skid when the left one hit? A. It was raised up and it hit the track and slid down the track. Q. If the left hind wheel had gone over the rail, the rear hind wheel could have come along later and struck the rail and slid also; the left one might have gone over, and the right one might have? A. The left one did not go over. . . . Q. How do you identify—from what thing that you saw, or know, how are you able to state that these wheels went along and commenced to skid at a place where this joint was? A. I do not know; it was right there where it was worn; just a little ways below where we started to skid; where it was worn. . . . Q. This place where the track is fastened together is a little east of where you started to slide? A. Yes. Q. How far east was this joint from the place where you started to skid or slide? A. I do not know; I cannot say. Q. If you know it was east, you must have some idea. A. I do not know; I have no idea; not far. Q. Was it three, five, or ten feet? A. I cannot say; I will not say. Q. How do you know it was east of it, at all? A. You could tell when you hit the place where it was joined together that it was rougher there than it was smooth. Q. You think that it hit harder there? A. Yes. Q. What did you notice about the truck before it hit that place? A. It commenced to skid. . . . Q. You have ridden in automobiles in Atchison for a good many years? How fast were you going? A. Yes; I do not think we were going over ten to twelve miles, if we were going that. I have no idea how fast we were going. Q. How fast were you going when

you hit the 'stop' sign? A. About twelve miles an hour. . . . Q. How fast were you going when you started to skid? A. About twelve miles an hour. Q. How fast were you going when you hit the 'stop' sign? A. I do not know.''

Robert Tull, one of the occupants of the automobile truck, testified: ''Q. Tell what happened that morning going over the bridge. A. We went across the bridge, and when we got our front wheels on the concrete, the hind wheels did not seem like they were going over, and they started to turn and the truck turned over and it mashed the cab off of it, and that is all. . . . Q. How far had you gotten alongside of the concrete when you began to skid? A. The rear wheels were between the rails and the front wheels over. . . . Q. You know as you come off of the main part of the bridge, built up of iron, onto where the road starts out over the ground, it is concrete on the left side? A. Yes. Q. How far had you gotten along that space of concrete when the car began to skid? A. I do not imagine over four or five feet of the concrete; I cannot say exactly. Q. Just as soon as you got on the concrete, or practically as soon as you got on the concrete, you started to turn; when the front wheels got over on the concrete, the wheels began to skid? A. No; not until they hit the rail. Q. How far had the rear wheels got along that part opposite the concrete when they began to skid? A. The front wheels were, I imagine, about four feet from the north side of the railing; the front wheels were on the concrete as you make the little zag around the curve. Q. When the front wheels got up on the concrete north of the north rail, about how far were the front wheels of the truck from the place where the concrete began, back of it? A. I think it started to skidding right after we got on the concrete. . . . Q. How far from this point (indicating on map), the west end of the concrete, how far from this point east was it when the rear wheels started to skid; how many feet? A. I imagine three or four feet from the connection. Q. The connection between the wood and the concrete? A. The connection and the rail; we started to skid on the west side of the connection. . . . Q. Pay attention to my questions; you see where the concrete commences at the west end; how far did you pass the line when the rear wheels began to skid? How many feet in your judgment? A. About four or five, I imagine. Q. That is your best recollection? A. Yes. Q. How far west of this joint in the rail was it that the wheels began to skid? A. I do not imagine it was over three or four feet. . . . Q. How fast was your car going when it went off the concrete and struck the macadam? A. I do not know; we were going sideways; eight or ten miles an hour. . . . Q. You know how fast you were going when you got there to the curve? A. About twelve miles an hour. Q. And not over

twelve miles an hour and slid forty feet? A. I do not think that we slid forty feet. . . . Q. From the time it began to skid, you did not have time to catch your breath to see what did happen? A. No."

Mabel Tilton, the fourth occupant of the truck, testified: "Q. How fast was the truck going when it got to the end of the planking? A. Between ten and fifteen miles. Q. Had it slowed up any since it started to skid? A. Yes. Q. How much had it slowed up; was it going half as fast when it passed off of the planking as it was when it started to skid? A. Yes. Q. How much had it slowed down while it was skidding? A. About eight miles. Q. Slowed down about eight miles? A. Yes. Q. And going about eight miles faster when it started to skid than when it went off the planking? A. Yes. Q. How fast was it going when it started to skid? A. I judge about five miles an hour."

Jack Ellis, a student in the Atchison High School, and who resided in Missouri, about two miles east of the bridge, was on his way to school and passed over the east approach of the bridge shortly after the truck had overturned. He testified, as a witness for plaintiff, as follows: "Q. Did you make any observation there at that time? A. I seen where the truck had skidded, and I seen glass there about fifteen feet, I should judge, from the bridge shanty where the watchman stays. . . . Q. You say you saw where the truck had skidded? Tell the jury where that started. A. As near as I could see where the boards had been—when the tire had skidded on the boards along the side of the rail where it had kind of raked up the boards like. Q. Can you take this and point out on the map where that was? A. Right along here (indicating on map). You could see on the boards where the truck had skidded at this joint along here—all in there you could see where the boards were damp like, and it kind of dried them. You could see where the rubber went on the boards. The truck started skidding right in here (indicating). Q. Put a cross mark there. A. Right along here, right at the edge of the rail there is a groove where the flange of the railroad wheels comes over the rail—goes there—right along at this joint is where the truck started to skid. Q. You say there is a groove? Tell the jury how wide that groove is. A. Possibly three or four inches wide, and the rail is between three and four inches high from the boards right here. At that time there was a joint where a board came over here, and there is a joint right there (indicating). Q. Joint at the place marked on the map 'joint?' A. No; joint on the rail. It is right here close (indicating), and I noticed that when a heavy car or truck would pass over here (indicating), these boards would go down here at this joint—would sink right here where they go together, and the boards would sink

down and the rail would be four inches high. Q. You made a mark on the map as to where the skidding started. We have to get it in the record. State where that is with reference to the point marked 'joint' on the map? A. It is directly west of the joint. Q. About how far would you say the skidding started west of the point marked 'joint' on the map? A. I should judge about ten feet, somewhere along there." Cross-examination: "Q. You said, did you not, that the skid marks started about ten feet west of this joint in the north rail; did you say that? A. Yes, sir. Q. And they stopped about ten or fifteen feet west of the east end of the concrete? A. Fifteen feet west of the east end of the concrete. . . . Q. Now, did you see more than one skid mark anywhere? A. I seen where this main skid mark was. I do not know anything about any other skid marks. I seen where it had skidded down the rail, but I didn't notice anywhere else. Q. Did you see any other skid mark than this one that you have specifically described? A. I never noticed any others. . . . Q. You say this rail was three or four inches above the level of the track? A. Above the level of the boards along the track. Q. Above the level of the boards in the center of the track between three and four inches? A. Yes, sir."

In passing upon appellant's contention that a demurrer to the evidence should have been sustained, or that a verdict should have been peremptorily directed for defendant, upon one or the other of the two grounds assigned by appellant, it must be borne in mind that there were no eye-witnesses to the occurrence other than the four occupants of the automobile truck, whose testimony was proffered by plaintiff, unless it may be said that defendant's witness Julius Schmidt was an eye-witness of the occurrence. The defendant's witness Schmidt was pitching hay on his farm some distance (not shown in the record) from the scene of plaintiff's injury. He testified that his view was obstructed by an intervening building, or structure of some kind, but that he saw the truck as it crossed over the superstructure of the bridge, and that he "don't suppose it was coming less than thirty miles an hour;" that the truck passed out of his line of vision as it went behind an intervening building, before leaving the superstructure of the bridge and before reaching the east approach, and that, "as soon as it [the truck] came out from behind the building on the east side there, I seen it just—kind of looked like it was going up in the air, and turned over."

All other witnesses, whether on behalf of plaintiff or defendant, testified solely as to physical observations made at the scene of plaintiff's injury after the occurrence was complete. Thus, it appears from the record that the four occupants of the automobile truck were in better position to know what actually occurred, prior to the overturning of the truck, than were the other witnesses in the cause;

and this is true, notwithstanding the fact that the four occupants of the truck were necessarily under the stress of excitement by reason of the sudden and unexpected occurrence.

A demurrer to the evidence admits as true every fact and circumstance which the evidence adduced by plaintiff tends to prove, and the plaintiff is entitled to the benefit of every inference of fact which may reasonably be drawn therefrom. [Stauffer v. Railway Co., 243 Mo. 305, 316, 147 S. W. 1032.] Furthermore, the evidence must be considered in the light most favorable to the plaintiff, and the evidence adduced by the demurrant must be disregarded as untrue, except in so far as the demurrant's evidence tends to aid the plaintiff's case. [Stauffer v. Railway Co., supra; Goucan v. Cement Co., 317 Mo. 919, 929, 298 S. W. 789; Morris v. Cement Co. (Mo. Sup.), 19 S. W. (2d) 865, 872.] A demurrer to the evidence is sustainable only when the facts in evidence, and the legitimate inferences to be drawn from such facts, are so strongly against the plaintiff as to leave no room for reasonable minds to differ. [Cech v. Chemical Co. (Mo. Sup.), 20 S. W. (2d) 509, 511.]

In the light of the foregoing rules, which are well established in the jurisprudence of this State, we cannot say that there is an entire absence of any substantial or probative evidence sufficient to show a causal connection between the alleged defective and unsafe condition of the roadway of the east approach of the bridge, at or near the joint of the north rail of the railroad track, and plaintiff's injury. Neither can we say that the facts in evidence, and the legitimate inferences to be drawn from such facts, are such as to leave no room for reasonable minds to differ upon the question whether or not the skidding of the automobile truck and the resulting injury to plaintiff were directly and proximately caused by the alleged unsafe and defective condition of the roadway of the east approach of the bridge at or near the joint in the north rail of the railroad track. Such issue is one of fact which must be submitted to the jury for determination; and it matters not what view the appellate court may entertain respecting the weight of the evidence, or respecting the credibility of the witnesses and of their testimony, for it is the province of the jury, as the constituted triers of the facts, to weigh the evidence, and to pass upon the credibility of the witnesses and of their testimony. [Gannon v. Gas Light Co., 145 Mo. 502, 515, 47 S. W. 907; Trust Co. v. Hill, 283 Mo. 278, 282, 223 S. W. 434; Keller v. Butchers' Supply Co. (Mo. Sup.), 229 S. W. 173, 175; Morris v. Cement Co. (Mo. Sup.), 19 S. W. (2d) 865, 872.]

Nor can we give assent to appellant's contention that a verdict should have been directed for defendant for the reason that the contributory negligence of plaintiff, as a matter of law, is conclusively established by the physical facts alone, which physical facts are

claimed by the appellant to conclusively demonstrate that the automobile truck must have been driven by plaintiff at a high and reckless speed, without attention to, or in wanton disregard of, the existing and present conditions. "So frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other." [10 R. C. L. 1009; Schupback v. Meshevsky (Mo. Sup.), 300 S. W. 465, 467.]

Nor does the fact (if it be a fact) that plaintiff, while under the stress of excitement due to the sudden and unexpected skidding of the rear wheels of the automobile truck, and while facing an emergency, may have failed to release the foot brake of the automobile, or to have turned the course and direction of the automobile, convict him of contributory negligence as a matter of law. "Conduct which might otherwise constitute negligence may not be so considered where the acts or omissions of the person injured occurred in the presence or under a reasonably well founded apprehension of impending danger, or in an emergency such as is calculated to produce fright, excitement, or bewilderment and affect the judgment. The rule is well established that, when one is required to act suddenly and in the face of imminent danger, he is not required to act as if he had time for deliberation and the full exercise of his judgment and reasoning faculties. It has been asserted that this is especially true where the peril has been caused by the fault of another." [45 C. J. 962, 963.]

II. Having reached the conclusion that, under all the evidence in the cause, the defendant-appellant was not entitled to a directed verdict in its favor, we pass to a consideration of the four instructions, numbered 10, 13, 20 and 22, given at the request of defendant, which instructions the trial court deemed to have been erroneously given, and upon which specified ground of error the trial court predicated the order granting a new trial. We quote such instructions in full, in order the better to disclose the nature and scope of such instructions, and their possible effect on the minds of the jury.

Defendant's given Instruction 10 reads: "The court instructs you that the mere fact that plaintiff's car skidded and turned over at the place complained of, if you believe it did skid and turn over at such place, is of itself no evidence of any negligence on the part of defendant, but before he is entitled to recover any damages, he must also prove by the preponderance or greater weight of the evidence that his injuries were caused by the negligence of the defendant, and you must also find that the plaintiff himself was not guilty of

any of the acts of negligence referred to in the other instructions, that directly contributed to the accident and injury.''

Defendant's given Instruction 13 reads: ''The court instructs you that even if you should believe from the evidence that the north rail of the railroad track at the east end of defendant's bridge, at and near the joint referred to in the evidence, projected so much higher than the adjacent flooring as to make it difficult and dangerous for an automobile crossing said bridge to the east to turn to the left at said point, or that the condition of the floor of said bridge in any other respect made it difficult and dangerous to make such turn, but you further believe from the evidence that by driving his truck in a careful and prudent manner and exercising the highest degree of care, as elsewhere explained in the instructions, plaintiff could have turned his truck across said north rail and proceeded upon said highway in safety, then your verdict must be for defendant.''

Defendant's given Instruction 20 reads: ''The court instructs you that if you find from the evidence that the failure of the plaintiff to exercise the highest degree of care, in respects elsewhere explained, of a careful and prudent person under the circumstances existing, and as same could be known to the plaintiff by the exercise of reasonable care in observation, caused or in any manner directly contributed to the injury to the plaintiff, then you need not consider the evidence further as to the condition of the bridge highway, and your verdict must be for the defendant.

''But if you find that the plaintiff was free from negligence contributing to the injury as above explained, then you should consider further as to whether the defendant was negligent in maintaining its highway at the place in question, and if so, the further evidence as to whether such negligence was the sole and only cause of the accident, and if you find in favor of the plaintiff as to all the matters above mentioned, then your verdict should be for the plaintiff.''

Defendant's given Instruction 22 reads: ''The court instructs you that it is not the duty of defendant to explain how the accident happened, or to account for it in any way. You are further instructed that you must not guess or speculate as to what was the cause of the accident or whose negligence, if any, caused it. Throughout the case the burden rests upon the plaintiff to prove by the preponderance, or greater weight of the evidence, each and every fact necessary to make his case under the instructions of the court. Before you can find a verdict for plaintiff, he must prove his case to your reasonable satisfaction. If, at the close of all the evidence, after hearing all the evidence and the argument of counsel and considering the case in the light of the instructions given you, the evidence is evenly balanced in your mind and you are unable to say whether or not the accident and injury were due solely to the negli-

gence of the defendant without any negligence on plaintiff's part directly contributing thereto, then the plaintiff has failed to prove his case, and your verdict must be for defendant."

It appears from the record herein that twenty-five separate instructions were given to the jury at the request, and on behalf, of the defendant. Two of said number related to the form of the verdict to be returned by the jury and to the number of jurors who might agree upon, and return, a verdict. The twenty-three other instructions given for defendant have relation to the submission of the several issues, and to the weight of the evidence and the burden of proof. A considerable number of such instructions are lengthy, and are involved and intricate in construction and phraseology. The very multitude of the instructions given at the request of defendant would tend to confuse and bewilder the lay minds of the jury. "It is necessary to any useful effect they may have on the minds of jurors that instructions should be as few, and short, and pointed as may consist with the object of giving clear ideas to the jury of the main points of law governing the case as applied to the facts. The simpler and plainer instructions can be framed and cover the issues, the better the jury will understand them, and the less liable will they be to run counter to some rule of law. It is very generally held improper therefore for counsel to ask, or for the court to give, long and numerous instructions, because it does not enlighten the minds of the jurors on the issues submitted, but tends rather to introduce confusion." [38 Cyc. 1689, and cases there cited.] In view, therefore, of the multiplicity of instructions given on behalf of defendant, and the tendency of such multiplicity of instructions to confuse and bewilder the lay minds of the jurors, the trial court should have been extremely cautious that none of the multitude of instructions given on behalf of defendant might be misleading or confusing to the jury, or might be in any wise conflicting with any of the instructions given on behalf of plaintiff. Likewise, it was the clear duty of the trial court to correct the error in giving any of defendant's instructions which had a tendency to mislead or confuse the jury, to plaintiff's prejudice, by granting to plaintiff a new trial of his cause of action.

In our opinion, the effect of defendant's given instructions numbered 10, 20 and 22 was to lead the jury to understand that the burden of disproving the defense of contributory negligence rested upon the plaintiff. Such is particularly true of defendant's given Instruction 22, which, after telling the jury that "throughout the case, the *burden rests upon the plaintiff to prove* by the preponderance, or greater weight of the evidence, *each and every fact necessary to make his case*," thereupon proceeds to tell the jury "if, at the close of all the evidence, the evidence is evenly balanced in your

mind and you are unable to say whether or not the accident and injury were due solely to the negligence of the defendant *without any negligence on plaintiff's part directly contributing thereto, then the plaintiff has failed to prove his case*, and your verdict must be for defendant." The defense of contributory negligence is an affirmative defense, and the burden of proving it rests upon the defendant. [45 C. J. 1171.] An instruction strikingly similar to defendant's Instruction 22 herein was held by this Division of our court to constitute reversible error. [Chaar v. McLoon, 304 Mo. 238, 250, 263 S. W. 174.] Defendant's given Instruction 13 directed a verdict for defendant if the jury should believe from the evidence "that by driving his truck in a careful and prudent manner and exercising the highest degree of care, . . . plaintiff could have turned his truck across said north rail and proceeded upon said highway in safety." By reason of its peculiar phraseology and grammatical construction, the said instruction seems to assume, and to argue, without requiring the jury to find such fact, that plaintiff was not driving the truck in a careful and prudent manner, otherwise he could have turned the truck across the north rail of the railroad track and proceeded upon the highway in safety. Hence, we deem said instruction to have been prejudiciously erroneous.

But appellant claims that the errors in the aforequoted instructions were invited by plaintiff, and were cured by other instructions given on the submission of the case to the jury. We have closely studied and analyzed the other instructions given, both on behalf of plaintiff and on behalf of defendant, and we find nothing in other instructions which may properly be held to have invited or cured the errors in the quoted instructions.

The action of the trial court in granting a new trial, for the reason, and upon the ground, specified in the order of the trial court, was proper. Therefore, the order of the circuit court granting a new trial is affirmed, and the cause is remanded to the circuit court for retrial. *Lindsay* and *Ellison, CC.*, concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.