WILLIAM P. WALSH v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—No. 38769.—182 S. W. (2d) 607.

Court en Banc, October 9, 1944.

*Joseph A. McClain, Jr.,* and *Arnot L. Sheppard* for appellant.

*Charles P. Noell* for respondent; *Douglas H. Jones* of counsel.

BOHLING, C.—William P. Walsh recovered a judgment for $25,000 against the Terminal Railroad Association of St. Louis, a corporation, for personal injuries sustained as the alleged result of defendant's negligent failure to warn plaintiff, who was engaged in unloading a car of electric cable, of a switching movement. Defendant appealed and questions the sufficiency of plaintiff's evidence, the correctness of plaintiff's main instruction; the propriety of remarks of plaintiff's counsel during the trial and in argument, and the amount of the verdict.

I. Defendant contends plaintiff failed to make a case in that: a. Plaintiff failed to show that defendant's switching crew had either actual or constructive knowledge of plaintiff's presence in the car. b. That, in effect, plaintiff, in jumping from the car, was guilty of negligence barring his recovery. c. Plaintiff's testimony was so contradictory and without explanation that it cannot be relied upon to sustain the judgment.

The accident happened July 24, 1942, in the private yards of the General Steel Castings Company at Granite City, Illinois, during the construction of an armor plant there by Frazier-Davis Construction Company. Plaintiff, an electrician, was an employee of the Burton Electric Company, a subcontractor. About 1:30 P. M. of plaintiff's first day on this particular job, his foreman instructed him and a man known as "Lou" to stop what they were doing and assist in unloading a car of reels of electric cable. Each reel or spool weighed

from 2200 to 2500 pounds, was about three feet wide and stood about four-and-one-half or five feet high, resting upon the floor on wheels at each end of the reel. There were about sixteen or eighteen reels of cable in the car, loaded, three in a row, crosswise of the car. The reels were kept in their proper place by wood blocks, spiked to the floor. The car was on a north and south track and, according to the evidence, Thomas L. Rhoden, who was yardmaster or checker for the Frazier-Davis Construction Company, instructed Joseph J. Ganzenbach, defendant's switch foreman, to move a certain car on another track and "spot" it south of the car containing the electric cable. The movement necessitated "pulling" the car of cable out and placing the other car to the south of it. When plaintiff and Lou arrived at the car of cable, both doors (the east and west center or side doors) were open and two men and truck were waiting. The four men proceeded to kick the blocks from in front of one of the reels of cable and load the reel on the truck at the east door. They were to unload the reel at a point in a building approximately one block from the place of loading, the building itself coming within about forty feet of the car. The cable was to be weighed, and the men in the truck traveled approximately a mile to the scale. When they arrived at the building, the four men unloaded the reel of cable. After unloading the reel, plaintiff and Lou walked to the car. The truck had to travel approximately a mile to reach the car. Plaintiff and Lou proceeded to unblock the reels and had three reels unblocked when the car was struck from the north in a switching movement in charge of defendant's employees. The impact threw plaintiff and Lou off balance toward the north and then, by the time they regained their balance, the car started moving north and the loose reels commenced to roll within the car. Plaintiff then told Lou "We had better jump out of here; we had better get out of here, with these reels moving." Lou jumped and then plaintiff jumped. Plaintiff landed a few feet north of Lou and suffered injuries as a result of his jump.

Plaintiff testified no one ever gave him any warning of the movement. Thomas L. Rhoden, defendant's witness, was the only witness to a warning. He testified, among other things, that he had warned the men unloading the reels of cable that the car was going to be moved, he thought between twenty and thirty minutes prior to the accident.

█ a. Defendant argues that it is admitted defendant's employees did not have actual knowledge of plaintiff's presence in the car and that there was no substantial evidence that they had constructive knowledge of plaintiff's presence. The argument is based on a part of the testimony only. Other testimony in the case disposes of █ the issue without further developing defendant's position. We take the following facts from the testimony of defendant's witness Ganzenbach, the switch foreman. The movement was on a private track and

he always watched out for persons being around. It was his "practice and duty" to look into cars before he moved them. In making the particular movement he stopped the engine about six feet north of the car plaintiff was in. There was no truck at the car. He walked to the west of the car and "seized up" underneath as sometimes a block or even a man is found underneath. He gave a signal to come back easy. Both doors of the car were open. About the time the coupling was made, he was at the east door of the car plaintiff was in. He looked in. He saw no one. He gave the signal and the cars started to move out slowly, not over two or three miles an hour. Lou jumped first—"he come near jumping on me." Then plaintiff jumped. Witness gave the stop sign and the engineer stopped "right now." According to plaintiff's testimony he was standing in the areaway between the two doors of the car, possibly back and a little to the south of the door. Defendant's argument states that plaintiff's testimony he "saw no one, heard no one, nobody notified" him they were going to move the car is far from saying foreman Ganzenbach did not look into the car. Plaintiff, of course, was not bound by the oral testimony of defendant's witnesses, which testimony the jury were privileged to consider in reaching their verdict and to believe or disbelieve in whole or in part. In these circumstances it was for the jury whether defendant, through its switch foreman Ganzenbach, had knowledge of the presence of the men in the car and a duty to warn of the impending movement; for Ganzenbach's testimony of his looking into the car could be taken by the jury as circumstantial evidence of his seeing plaintiff in the car when he looked. Beck v. Chicago, R. I. & P. Ry. Co., 327 Mo. 658, 664, 37 S. W. 2d 917, 919; English v. Wabash Ry. Co., 341 Mo. 550, 557, 108 S. W. 2d 51, 54; Dutcher v. Wabash Rd. Co., 241 Mo. 137, 165, 145 S. W. 63, 71; Carner v. St. Louis-S. F. Ry. Co., 338 Mo. 257, 267, 89 S. W. 2d 947, 953; Beal v. St. Louis-S. F. Ry. Co. (Mo.), 256 S. W. 733, 736. Among other evidence from defendant's witnesses favorable to plaintiff warranting a like conclusion was: Ganzenbach testified, that at the time of the movement "the truck was gone out of there; they had never reappeared," indicating he knew of the former presence of men in and about the car.

■ b. Defendant's argument here is that there was no causal connection shown between defendant's failure to warn and plaintiff's injury; i. e., plaintiff's jump caused the injury. It is based on the cross-examination of plaintiff's witness Rogers, a Burton Electric Company foreman, that after the accident he found the reels in the car north of the door in place and two of the reels south of the door "moved up several feet" and in another place "about a foot or two." Relying upon cases like Draper v. Louisville & N. Rd. Co., 348 Mo. 886, 898[6], 156 S. W. 2d 626, 633[11, 12], to the effect that where a litigant's only witness to establish a given fact gives positive

testimony one way on direct examination, the litigant may not have the jury disregard this positive testimony and find the opposite to be the fact from inferences deducted from other testimony of the same witness, defendant contends there is no other testimony of record as to the extent of the movement of the loose reels and plaintiff is bound by Rogers' testimony which established that plaintiff was in no danger and had no sufficient reason for jumping. The limited application of the rule to situations wherein there is no evidence from other witnesses permitting of the contrary finding is stated and recognized in defendant's cited cases. See for instance Smithers v. Barker, 341 Mo. 1017, 1023, 111 S. W. 2d 47, 50[2]. This contention ignores plaintiff's testimony that when the coupling was made and the "pull out" movement started the reels of cable in the car were rolling; that he then knew he had to do something, and that Lou jumped first and witness then jumped. Plaintiff's testimony established, if believed, that the reels were rolling while the movement was taking place. Rogers' testimony was not contra and did not establish the opposite. Rodan v. St. Louis Transit Co., 207 Mo. 392, 408, 105 S. W. 1061, 1066; Perryman v. Missouri Pac. Rd. Co., 326 Mo. 176, 183, 31 S. W. 2d 4, 7; Smith v. Kansas City Pub. Serv. Co., 328 Mo. 979, 991, 43 S. W. 2d 548, 553.

c. Here defendant cites Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 728, 62 S. W. 2d 1079, 1081. Defendant ▆ says plaintiff contradicted himself in this: By stating he was not near the door—he was near the door; that he was doing nothing— he was kicking blocks loose when the coupling was made; a minute elapsed, only three or four seconds elapsed between the coupling and the start of the movement out; he waited for Lou to jump—he did not wait for Lou to jump. We understand these factual matters to be not decisive of plaintiff's case. They might affect a witness' credibility but were incidental to rather than controlling on the cause of action. Essential factual elements of plaintiff's case were established by substantial evidence; and under the ruling in Clark v. Atchison & Eastern Bridge Co., supra, the question was for the jury: "The court has the right in any case to determine as a matter of law whether there is any substantial evidence to sustain an issue of fact; but, on determining that there is such substantial evidence, it will not go further and determine whether the weight of the evidence is in favor of or against the mooted fact. That is the province of the jury." We are unable to concur in defendant's statement that plaintiff's testimony was so contradictory and without explanation in the respects mentioned as to preclude reliance thereon; for instance: As we read the record, plaintiff first responded to some general questions with general answers and then when cross-examined more specifically, he replied in greater detail. When read in the light of the attending circumstances it was for the jury to determine whether his testimony

was contradictory, and to pass on his credibility as a witness and the weight and value of his testimony, especially so with respect to the constitutive facts of his case. We understand defendant does not question that if plaintiff's testimony established the reels were rolling he was confronted with an emergency not of his creation. Clark v. Atchison & Eastern Bridge Co., 324 Mo. 544, 562, 24 S. W. 2d 143, 152[11, 12]; Menard v. Goltra, 328 Mo. 368, 384, 40 S. W. 2d 1053, 1060[17].

Plaintiff made a submissible case.

██ II. Defendant's complaints of the conduct of plaintiff's counsel during the reception of evidence and in arguments are considered together.

Complaint is made that counsel wrongfully prompted plaintiff and wrongfully accused defendant's counsel of attempting to confuse plaintiff on cross-examination. The following, among other things, occurred. Inquiry was being made as to the lapse of time between the making of the coupling and the "pull out" movement:

"Q. How long was it between jars? A. It wasn't very long; I couldn't exactly say how many minutes.

"Q. Was it a mere snap of your fingers, or an appreciable . . . A. I imagine it was about a minute, anyway.

"Q. During that minute what did you do? . . . A. We couldn't do anything; we was all dumbfounded; we didn't know what hit us. . . . We just got knocked around in the car; that is all we did do. . . .

"Q. During that minute between the time the first jar came and it started to move out, you didn't do anything? A. Well, no, it was too fast.

"Q. It was what? A. It was too fast; everything happened just like that (illustrating).

"By Mr. Noell: Then you didn't mean a minute—

"By Mr. Sheppard: Just wait a minute; let me examine this witness.

"By the Witness: What I am saying is just about a minute.

"By Mr. Noell: Pardon me for interrupting you; he described it as a snap . . .

"By Mr. Sheppard: I object to these remarks during my cross-examination; the witness and I are getting along fine; if counsel will just keep quiet and let me examine this witness, I will appreciate it.

"By Mr. Noell: This cross-examination Mr. Sheppard is making, he is attempting to confuse the witness. A minute is a long time, but a snap is a second; I don't want him to confuse the witness.

"By Mr. Sheppard: I know perfectly well what Mr. Noell means; he has told his witness he is mistaken in saying it was a minute; his purpose is accomplished, and I certainly object to it.

"By Mr. Noell: Without me saying a word, he said it was like a snap.

"By Mr. Sheppard: I think it is so prejudicial, I think I will have to ask for a mistrial.

"By the Court: Motion denied." (Exception saved.)

Plaintiff stood by his answer that it was "about a minute" under further cross-examination stating he saw no reason to change his testimony. Recalled to the stand after the noon recess he testified his counsel had mentioned this testimony about the "minute" and after considering he, plaintiff, was mistaken and there were only three to five seconds between the coupling and the beginning of the "pull out" movement. The court, in overruling defendant's motion for a mistrial, might have indicated with propriety that the conduct of plaintiff's counsel was not approved, as defendant's expressed objection thereto appears to have been well taken.

 Plaintiff suffered a chip fracture of the tibia of his right leg, which extended into the knee joint. It was comminuted and necessitated the use of wire in its reduction. About a week after the accident he developed thrombophlebitis in his right leg. He was discharged from the hospital on October 20, 1942, but returned November 1st with thrombophlebitis in his left leg. He was again released on February 2nd. On February 23rd he returned with his knee swollen, discolored, and painful. This condition improved upon treatment. Defendant complains that plaintiff's counsel unduly emphasized the possible results of thrombophlebitis, it being speculative whether plaintiff would ever suffer another attack thereof. We mention this complaint without taking the space necessary to develop it in detail.

Defendant called a shorthand reporter to impeach plaintiff. He had taken a statement made by plaintiff on November 9, 1942. The reporter testified he had not checked the transcription with his notes. Defendant's counsel then asked the witness to refer to his notes with respect to matters found on a given page of the transcribed copy for correctness, whereupon the following occurred:

"By Mr. Noell: I have no objection to your reading his entire statement to the jury. I haven't read it myself, but read it.

"By Mr. Sheppard: I will read the portion of it I am interested in.

"By Mr. Noell: Why don't you read the whole thing? You shouldn't pick out one portion.

"By Mr. Sheppard: You know exactly why I am not doing it. You are trying to put me in the nine hole with the jury.

"By Mr. Noell: No . . .

"By Mr. Sheppard: Why are you suggesting such a thing? Any lawyer knows better than that.

"By Mr. Noell: Any lawyer knows you shouldn't pick out part of a statement . . .

"By Mr. Sheppard: That isn't the law.

"Mr. Noell: . . . You should read the whole thing.

"By Mr. Sheppard: You are instructing me how to try my case?

"By Mr. Noell: Go ahead, Mr. Sheppard."

It is evident defendant took exception to the conduct of plaintiff's counsel but he made no request of or objection to the court. Defendant now formally complains of the incident and states it should not receive judicial approval. Contrary to plaintiff's contention, we understand Peppers v. St. Louis-S. F. Ry. Co., 316 Mo. 1104, 1115 (VIII), 295 S. W. 757, 761[11], not to hold that, merely because of its use for impeachment purposes, the whole of a written instrument is for the jury irrespective of the relevancy of individual portions to the inquiry at hand. We think plaintiff's counsel suggested reading the whole of the statement to secure an undue advantage of defendant, to put defendant "in the nine hole with the jury," as stated by counsel.

Defendant's witness Rhoden was a soldier, corporal, stationed at McChord field, near Tacoma, Washington. He testified that defendant made arrangements with his commanding officer for him to come back to testify, defendant agreeing to take care of his expenses; and that he had no interest in the lawsuit. On cross-examination, plaintiff developed that the witness arrived Saturday afternoon and had not been in the courtroom until that morning. Upon objection, plaintiff's counsel stated he was prepared to show the witness' interest in the case. Defendant's counsel admitted that the witness had been to the defendant's office several times, had talked with him about the case, told him what he was going to testify to and that otherwise he would never have put the witness on the stand. Witness then explained that he had been in the army eight months, appeared due for oversea's service; and that when defendant asked him to come back to testify, he "jumped at the chance to come home and see my father and mother a couple of days." Witness also read a letter written to him by Mr. Noell and his reply, and made a statement in connection therewith. Mr. Noell's letter, on behalf of plaintiff, sought witness' knowledge of the facts, particularly whether he gave defendant authority to move the cars. Witness' letter in reply stated that a railroad claim agent called on him in Washington and that although witness was busy and suffering from an injured hand, he made a statement but regretted doing so after thinking it over. The letter also stated witness had not told all he knew or the more important facts "and I don't intend to state them to anyone unless I receive compensation and [am] put on the witness stand in proper form"; that his release could be secured to testify and "until then I am not making any more statements," and closed with the thought he wanted

to help plaintiff in any way possible. With this background, Mr. Noell's closing argument was in part: "I make an issue of this man Rhoden. . . . Shame on the company that brings a man in court, that will very soon be across the seas; shame on them and on him, taking advantage of his desperation to get a furlough. How do you know who was behind his testimony in this case? Somebody else behind the scenes has caused that man to testify as he did. . . . Every fact that Rhoden testified to was unreasonable and against the physical facts. It is not reasonable to suppose if he had told these men that car was going to be moved that they would have stayed in it. Does Billy Walsh impress you as a liar? Does he impress you as an untruthful person? No, Billy Walsh wouldn't have wanted any gains gotten in that way, and I wouldn't be his lawyer if he ever undertook it. The whole tenor of this letter written on United States Army stationery was to the effect that for money he would give me a statement. Now, suppose I had answered back: 'Certainly, Mr. Rhoden, we will give you money'; what a position I would be in. I wouldn't be an honest man myself, because you can see from the letter he wants money for his testimony. I don't want that kind of evidence. He came into court with my client, who is corroborated by physical circumstances, and he doesn't have to have testimony of this kind. But what did the Terminal do? Did they get the same kind of letter, and say: 'Oh, yes, we will make arrangements for you to come over; come on over here, stay in our surroundings from Saturday to Thursday; don't show up in court.' The inference is plain what occurred there. This man probably reluctantly testified against this man; so I say, shame on the Terminal that they would stoop to a thing of that sort. The inference is plain. Gentlemen, it stinks. There can't be any doubt about a thing of this sort, and through that method they would rob this man of the justice he is entitled to at your hands. Imagine tactics like that on the part of the great Terminal Railroad Association. How long should democratic institutions last if they could get juries to do a dastardly act like that?"

Counsel for defendant objected, stating the argument was without the evidence, unfair, and the charge untrue; and requested that plaintiff's counsel be reprimanded. This was overruled and exception was saved.

These denunciations of defendant were not based on facts proved or on legitimate inferences from facts proved. They were criminal charges against defendant as a litigant in the cause at trial. They were not directed to the merits of the controversy. Their purpose was to arouse hostility to and hatred for defendant among the jurors and thwart the discharge of their duty to calmly deliberate on the merits of the case and bring in a verdict based on that even-handed justice which all litigants are entitled to demand. The verdict in this case was signed by ten jurors. There was no evidence that

defendant had Rhoden stay in its "surroundings" and away from court. The record refutes the charge that such conduct could continue from Saturday to Thursday. The trial started on Monday. The jury returned their verdict on Tuesday. Whether or not Rhoden told the truth, there was no evidence of wrong doing on the part of defendant; much less any showing to sustain the charge that defendant was attempting to "rob" plaintiff of justice, or attempting "a dastardly act like that," or was guilty of subornation of perjury, or of any act justifying the characterization that "it stinks." This soldier-witness' letter to Mr. Noell, when read as a whole as written instruments should be read, has to be twisted to make out of it an offer to commit perjury for compensation. The charge made against defendant was not an issue within the evidence or the case. Plaintiff sought an unfair advantage. The court's failure to sustain defendant's objection and rebuke plaintiff's counsel stamped the charge with the sanction of the court and accentuated the error. Judgments have been reversed for arguments less vicious when without the evidence, even though the court in some instances sustained the objection interposed.

In Jackman v. St. Louis & H. Ry. Co. (Mo. App.), 206 S. W. 244, plaintiff's counsel, in argument, stated that defendant tried to "buy" him "like their agent, Dameron." Upon objection to the statement the witness Dameron or any one else had been paid and request for reprimand, counsel withdrew the remark, the court sustained the objection and asked the jury not to consider the remark, but administered no rebuke. There was no evidence to sustain the statement. Recognizing that considerable latitude is allowed in stating conclusions or deductions in argument, the court entertained not the least doubt that statements of like nature, unsupported by evidence, were reversible error when uttered for the obvious purpose of arousing the passion or prejudice of the jury or the creation of a feeling of resentment against or aversion to the opposing party; that such remarks called for prompt and emphatic action on the part of trial courts to guard against a miscarriage of justice and that the action of the court (instructing the jury to disregard the remarks and counsel to stick to the evidence) was insufficient. See also: Ryan v. Sheffield Car & Equipment Co. (Mo. App.), 24 S. W. 2d 167, 169[5, 6]; Henry v. Illinois Central Rd. Co. (Banc), 282 S. W. 423, 425[7]; Lewellen v. Haynie (Mo.), 287 S. W. 634, 649. Somewhat similar remarks, but less vicious, were condemned in Monroe v. Chicago & A. Rd. Co., 297 Mo. 633, 644, 249 S. W. 644, 646[1, 2], 257 S. W. 469, the court quoting Goode, J., as follows: " 'Trials before juries ought to be conducted with dignity and in such a manner as to bring about a verdict based solely on the law and the facts. Hence reckless assertions unwarranted by the proof and intended to arouse hatred or prejudice against a litigant or the witnesses are condemned as tending to cause

470

a miscarriage of justice.' Beck v. Quincy, O. & K. C. Rd. Co., 129 Mo. App. 7, 24, 108 S. W. 132, 138.''

The record upon retrial may differ and cause for defendant's complaints may not exist. There is no occasion to extend this opinion for their development under the record now before us.

The judgment is reversed and the cause is remanded on account of the error noted.

PER CURIAM:—The foregoing opinion in Division Two by BOHLING, C., is adopted as the opinion of the Court en Banc. All concur except *Tipton, J.,* absent.