HENRY KRAMER, Appellant, v. GRAND NATIONAL BANK OF ST. LOUIS, a Corporation.—81 S. W. (2d) 961.

Division One, April 17, 1935.

*A. Samuel Bender* and *Robert L. Aronson* for appellant; *Robert E. Hannegan* of counsel.

*Cave & Hulen* for respondent.

COLES, J.—This is a suit brought by appellant Henry Kramer as plaintiff in the Circuit Court of the City of St. Louis against Grand National Bank of St. Louis, Ed Mays, Gifford J. Herbert and William A. Brittin, as defendants, for the recovery of damages alleged to have been sustained by plaintiff as the result of the theft of diamonds, jewelry and money from a safe deposit box, rented by the plaintiff from the defendant bank. Plaintiff alleged that the theft of the contents of his safe deposit box resulted from the negligence and carelessness of the defendants in failing to properly guard and safeguard the defendant bank's safe deposit vault and particularly the safe deposit box rented to plaintiff, and set forth the negligence complained of in ten specifications. At the close of plaintiff's case in the trial court plaintiff dismissed his suit as to the defendants Ed Mays, Gifford J. Herbert and William A. Brittin. In his petition plaintiff set forth in detail the items of property alleged to have been placed in his safe deposit box and to have been stolen therefrom, and also the value of each item and sought recovery in the aggregate sum of $38,365. The total damages for which recovery was sought by plaintiff included the alleged value of "loose diamonds," mounted diamonds, mountings and jewelry averred to be of the value of $35,665. And also the sum of $2700 "cash." Among the assignments of negligence set forth in plaintiff's petition was the following: "Defendants negligently and carelessly left the whole of said bank and the entrance to said safe deposit vault wholly unguarded by any watchman or other persons during the early part of May 25, 1930, while said vault was in the unprotected and exposed condition hereinbefore described, to entrance by burglars and thieves." Other assignments of negligence charged in plaintiff's petition will require consideration upon this appeal but they will be discussed hereafter. The defendant bank filed a general denial to plaintiff's petition. At the close of all the evidence in the trial court defendant requested an instruction in the nature of a demurrer to the evidence which the court refused to give. The jury returned a verdict in favor of defendant upon which judgment was entered. Plaintiff's motion for new trial was overruled in due course and thereupon plaintiff was granted an appeal to this court.

The alleged errors of the trial court assigned and urged in this court by appellant are:

1. The trial court erred in giving defendant's Instruction No. 3.

2. The trial court erred in refusing to give Instruction No. 2 requested by plaintiff.

3. The trial court erred in modifying plaintiff's Instruction No. 2 and in giving such instruction as so modified as an instruction by the court.

4. The trial court erred in refusing to give Instruction A requested by plaintiff.

5. The trial court erred in admitting in evidence, over plaintiff's objection, a document described as Defendant's Exhibit C.

The respondent bank contends here:

1. That appellant, upon the evidence, did not make a case which properly could be submitted to the jury and that the trial court should have sustained respondent's demurrer to the evidence.

2. That as a submissible case was not made by appellant in the trial court, the judgment below was under the evidence for the right party and hence the errors complained of by appellant, if in fact they constituted errors, were harmless and not prejudicial.

Since the contention made by respondent that appellant did not make a submissible case, if tenable, may be determinative of the merits of this appeal we shall first address ourselves to that contention. The contentions made by the parties in this court require a more detailed statement of the rather voluminous evidence than would otherwise be necessary. The uncontradicted evidence showed that the Grand National Bank of St. Louis conducted a bank on the west side of Grand Avenue near Olive Street in St. Louis and also maintained a safe deposit department in the basement of the building which it occupied. The safe deposit department of the bank was entered by going down a flight of stairs from the general banking room of the bank and the director's room of the bank was also in the basement adjacent to the safe deposit department. On reaching the basement, the safe deposit department was entered by passing through a "grill" or door constructed of iron or steel bars. There was a vault in the safe deposit department in which there were tiers of safe deposit boxes rented to patrons of the department for their use. Adjoining the vault was a room and also private anterooms where patrons of the department could take their safe deposit boxes. In December, 1927, the appellant Kramer rented a safe deposit box from the bank and continued as the renter of the box until the time of the robbery or burglary to be hereafter mentioned. For about three weeks prior to May 25, 1930, the bank was engaged in preparing to move, and in moving, the safe deposit department to the Continental Life Insurance Company's building which immediately adjoined the premises then occupied by the bank on the west. Prior to the date just mentioned a large round steel door, which had been the entrance door to the safe deposit vault had been taken off the vault and removed next door to the Continental Life Building. This round door was seven feet in diameter, eight inches thick, weighed about seventeen and a half tons and was equipped with a time lock. Upon the removal of the large door mentioned, and prior to May 25, 1930, new doors to the safe deposit vault were installed. These new doors consisted of an outer metal door about four feet by six feet in dimensions with a combination lock and an inner fire door. As these new doors were smaller than the round door which had

been removed, brick work was put in place around them to fill the opening to the vault. Prior to the morning of May 25, 1930, one or more of the tiers containing safe deposit boxes which previously had been attached to the walls of the vault had been removed from the walls so that the metal backs of the tiers were exposed and assessible. The backs of these tiers were covered by sheet metal about a quarter of an inch thick. No burglar alarm system or device was installed on the premises of the bank or its safe deposit department. At the request of an officer of the bank a detail of metropolitan police officers were placed and kept on duty at the bank throughout the day and night from about April 29, 1930, until about May 16, 1930. After the last-mentioned date at the request of an officer of the bank the police officers on duty at night were withdrawn. Later, all police were withdrawn at the request of an officer of the bank and no police officers were on duty at the bank or at its safe deposit department after the close of business at the bank on Saturday evening, May 24, 1930. In the early morning of Sunday, May 25, 1930, burglars entered the safe deposit vault of the bank, in some way not disclosed by the evidence, and broke into and carried away all or a part of the contents of a number of safe deposit boxes. In most instances access to the boxes and their contents was had by prying off or tearing away the metal sheeting on the backs of tiers of boxes which had been removed from the wall of the vault. In a few instances the boxes were broken open from the front.

Plaintiff Henry Kramer testified: That he first entered the jewelry business in New York City in 1905; he had no store but at first dealt in "jobs;" later he went into "real jewelry business" and dealt in "solid gold rings, mountings, gold cuff buttons, little diamonds and diamond settings;" he then had no place of business but went out and "tried to peddle to the store keepers;" later he took an office which he shared with one or more other persons; he remained in New York until 1922 when he moved to Milwaukee and took his "stock" with him. At that time his stock was worth about $45,000 or $46,000 "maybe fifty." Asked from whom he purchased his goods while in New York he testified: "I bought some downtown, sometimes at auctions and pawnshops;" "I don't remember the names so long." Pressed further for the names and addresses of persons from whom he had purchased goods in New York he replied "Spiro and Hirsh;" "Downtown;" "Maiden Lane, about the jewelry district there." Asked about his purchases of diamonds while in New York he testified as follows:

"Q. And from whom were you buying your diamonds while in New York? A. Different people.

"Q. Give me the names of a few of them. A. Mr. Kiel.

"Q. Where was his office located? A. Second Avenue, near 42nd, or 23rd Street. I don't remember. He moved.

"Q. What is his full name? A. I don't know his name. Kiel Jewelry Company; that's how it went.

"Q. Who else? A. Mr. Greenspon.

"Q. What was his full name? A. Harry Greenspon. No, Herman Greenspon.

"Q. Where was he located? A. On Livingstone at the corner of Clinton.

"Q. Who else? A. I bought in pawnshops. I bought at auctions at 70 Bowery. There is a steady auction going on for years, and only jewelers can buy there, no private people.

"Q. You bought from pawnshops? A. Yes, sir.

"Q. What one? A. Anyone, if I can get a bargain.

"Q. Name what location—the location of some of them. A. I think Frey's pawnshop; Frey I think.

"Q. Frey. Do you remember the first name of Frey? A. Frey & Sons.

"Q. Where were they? A. They were on Third Avenue, near Hudson.

"Q. What other pawnshops? A. Oh, a few more. I can't remember them.

"Q. You can't remember any more? Where were these auctions at which you bought jewelry? A. They are still there.

"Q. Where were they? A. 70 Bowery, New York. It is near Hester or Grand.

"Q. Did those fellows have a name? A. Why, sure, Jewelry Auction.

"Q. What was the name of one? A. Jewelry Auction; jewelry and diamonds.

"Q. Did you just buy from that one? A. I bought wherever there was a bargain.

"Q. Did you do all your buying from this one? A. No.

"Q. What other ones did you buy from? A. Well, in some pawnshops.

"Q. I mean what other auction houses? A. I don't remember now. That's a long time ago."

Plaintiff further testified: That after his removal to Milwaukee he remained there about five or six months; he had no place of business in Milwaukee other than his home or flat; he sold some jewelry in Milwaukee and made some purchases there; in 1923 he removed from Milwaukee to Chicago and remained in the latter city for "over four years;" upon his removal to Chicago he carried his stock of jewelry with him and "kept it in the Lincoln State Bank;" the stock he took from Milwaukee to Chicago was worth about $45,000; he had no place of business while residing in Chicago but sold from

his house, "went out selling;" while in Chicago his wife "had a confectionery" and he and his family lived upstairs over the confectionery; he worked in the confectionery "on Saturdays or a rainy day;" he bought considerable jewelry while in Chicago, but was unable to give the name and definite address of anyone from whom he made purchases there; in 1927 he removed from Chicago to St. Louis and brought with him all the stock of jewelry, diamonds, etc., he then had and placed it in a safe deposit box in a bank "downtown;" in December, 1927, he rented a safe deposit box at the Grand National Bank and "put in the new box whatever I had downtown;" he had a "little book" showing the items of jewelry, diamonds, etc., which he placed in his safe deposit box at the Grand National Bank and he checked up the items when they were placed in the box; he had a duplicate copy of this book and one copy of the book was placed in the box and the other retained by him; on Monday morning, May 26, 1930, the day after "the robbery" he went to the bank with his wife with a view to visiting his box and Mr. Ledbetter, the vice-president of the bank, told him he could not go down to the safe deposit department then and requested that he come back about four o'clock that afternoon; about four o'clock on the afternoon of the same day he returned to the bank with his wife and went down to the safe deposit department where he saw Mr. Herbert, the cashier of the bank, gave his keys to Mr. Herbert and he went over to the box; that "the box was entirely gone; there was no box there; I didn't see the box anymore;" upon the same occasion Mr. Herbert gave him an envelope "with some stuff that was left;" Herbert gave him a new box and he put the envelope and its contents in this new box, but did not check up what was left that day as "I saw already everything was gone;" that "they" gave me a new box and said: "Don't worry, go home and we'll make good; we are insured for it;" he returned to the bank two days later with his son and a friend, Mr. Goodman, and took the "new box" with its contents to "a separate room" and placed the contents of the box on a table and with the assistance of his son and Mr. Goodman checked up the items and "made up a list of what was left and what was missing." Plaintiff gave testimony as to the items, of property "lost" and the reasonable value of each item. He testified that the "total value of the jewelry and diamonds, mounted and unmounted, and the mountings which I lost in the robbery was $35,665; also $2,-700 in cash." That he also lost in the robbery some life insurance policies, bills, and "private papers;" he made a demand on the bank "for the return of my property." Plaintiff also testified: that when he came to St. Louis in 1927 he lived at 3840 Olive Street "up stairs;" he later occupied the "down stairs" premises at that address and engaged in the hand laundry business under the name "New York. Hand Laundry;" the laundry belonged to him although his wife

"took care" of it and he was largely occupied in soliciting work for the laundry; the laundry was a profitable venture for a time, but he "got sick" and the laundry "ran down" because he was unable to do any soliciting for it and the business was sold in October, 1930, for $700 or $800; he had no records showing whether or not the laundry business was a profitable one; while in St. Louis prior to May, 1930, he had no income other than such as he derived from the laundry business and from the sale of jewelry for which he received about $1000; the money in the safe deposit box was not placed in the box all at one time; he put in the box about $500 which he brought from Chicago, the $1000 proceeds of jewelry sales and the remainder was money derived from the laundry business and placed in the box from time to time.

Manuel Goodman, a witness for plaintiff, testified: That he was engaged in business as a pawnbroker in St. Louis; at plaintiff's request he accompanied him to the Grand National Bank on Wednesday afternoon after the "robbery;" he assisted plaintiff and his son in checking up some articles which plaintiff brought out in an envelope; he "saw that there were some mountings and set diamonds;" he had never seen the book marked Exhibit No. 1 prior to that occasion; "there were no loose diamonds in the envelope that day."

Harry Kramer, a witness for plaintiff, testified: That he was plaintiff's son; he accompanied plaintiff and witness Goodman to the bank on Wednesday afternoon after the robbery; plaintiff obtained his safe deposit box from the custodian of the safe deposit department; the box was taken to a little anteroom and plaintiff opened it and he, plaintiff and Goodman checked up the contents which "consisted of mountings and mounted diamonds; there were no loose diamonds;" prior to the robbery he had seen his father open his safe deposit box at the bank; "I knew he had jewelry and diamonds in it and some papers though I never did count the contents of the box."

Ben Stozier, a witness for plaintiff, testified: That he was working for the bank as janitor at the time of the robbery; he went to the bank on Sunday morning May 25, 1930, arriving about six-thirty A. M.; when he got to the bank he unlocked the door and went in and locked the door behind him; he then "called for Pat Hartnett the watchman;" no one answered; he "called for the other watchman, Mr. Seifert;" no one replied; he "guessed there was no one there;" he went downstairs and changed his clothes to go to work and came upstairs and went to the washroom, got his mop and bucket and was "just about twenty-five minutes in getting through and went down the steps through the grill gates, right by the vault, and unlocked that door and put on the light and put my mop away and locked the door again and shook it to see if it was

all right and went back up stairs, got ready to go home and went down the side steps;" when he "first went in the bank and pulled these lights on and stepped into the basement, the basement door was open and I pulled out that light and when I stepped inside a man said 'hands up, back up;'" he was confronted by six men with masks on who "had guns on them;" the masked men were in the basement then, not in the vault; the men "tied him up" and placed him in the director's room; it was about seven o'clock when he was ready to go home that "these men pulled the gun" on him; Mr. Brittin came in about 9 or 9:30 o'clock, he was caught by the burglars and "tied up too;" that "those fellows had me tied, I don't know what was going on I couldn't see, I heard a little hammering down there, like they were in the vault, I heard something go off like a firecracker but what it was I don't know;" he "was still there when they left but I was tied up out in the director's room;" he "was still there about 11:30 in the morning;" he did not see Hartnett or Seifert nor anyone employed or connected with the bank there that morning prior to the time "the men pulled the gun" on him; he did not "see these men get in the bank and I can't tell how they got in or got out."

John R. M. Polk, a witness for plaintiff, testified: That he was a newspaper reporter; he went to the bank about 12:30 noon on the day of the robbery; he went down to the basement to the safe deposit department; "the door to the vault was standing wide open; it was an ordinary sheet metal door; I did not notice any marks on it or notice it particularly;" he noticed "some few minor articles of jewelry scattered about" on the floor of the vault; he "talked to the men who were held up by this negro, Stozier and Brittin and got their stories of what happened."

William A. Wiley, a witness for plaintiff testified: He was a sergeant of the St. Louis police force and visited the bank on Sunday morning after the robbery; the door of the safe deposit vault was standing open; "it looked as if some one had blown it open or busted it open with a sledge hammer, busted the combination off;" "we examined all over and couldn't find out how they got in there whoever it was."

The evidence submitted on behalf of defendant in the trial court conflicted sharply with that offered by plaintiff on most of the crucial issues of fact in controversy between the parties. Warren Covington, assistant cashier of the bank, a witness for defendant, testified: That at the time plaintiff and his wife visited the safe deposit department of the bank on Monday afternoon following the robbery witness was in the vault and met them there; plaintiff gave him his key and that he found his box; plaintiff's box was in a tier of boxes which had been removed from the wall of the vault; he "got out" plaintiff's box from the back of the tier by prying off the sheet

metal on the back of the tier which covered the box; he removed the box in this way for the reason that access to the box from the front was obstructed by other tiers of boxes which were being moved and that it took "five or six men to move one of those heavy tiers;" some of the sheet metal backing on the tier of boxes containing plaintiff's box had been ripped off exposing certain boxes but the sheet metal backing in the rear of plaintiff's box had not been taken off and his box was not exposed and the whole end was entirely protected by the sheet as I found it;" on removing plaintiff's box from the tier he handed it to plaintiff and plaintiff lifted the lid and said, "Ain't that fine it is all there;" plaintiff said, "It is exactly like I left it;" plaintiff examined the box some; there was a chamois bag in the box tied with a string; "the box was completely full of stuff" and plaintiff "picked up some of his ropes of mountings that he had strung like beads, put them back in there and the box was closed again;" plaintiff asked for a new box and was given one; witness saw two bags "and those mountings and a lot of papers and the box was completely filled, so full in fact that you had to press it down before you could push it back in place;" witness did not examine "the bag" himself; plaintiff took the box given him by witness and "put it in the new tier;" plaintiff "made no complaint at all."

James A. Van Loon, a witness for defendant, testified: That he was a director of the bank and was present in the safe deposit vault on Monday afternoon following the robbery; on that occasion he saw plaintiff and his wife there with Mr. Covington; he saw Covington get out a box from the rear of a tier of boxes and hand it to plaintiff who raised the lid and said "there is nothing missing there;" plaintiff took the same box given him by Covington and put it in "another opening or tier."

Joe Ledbetter, a witness for defendant, testified: That he was vice-president of the bank and on the Monday afternoon following the robbery plaintiff and his wife called at the bank and asked if they could go down to the safe deposit vault and he told them they could do so; plaintiff went "down;" a short time later plaintiff came back to witness and witness asked plaintiff "if he had found everything all right and he smilingly replied that he found everything just like he left it and had no loss."

Ed Mays, a witness for defendant, testified: That he was president of the bank; on March 20, 1931, plaintiff called to see him relative to obtaining a loan from the bank; on that occasion plaintiff stated to witness that "the bank did not owe him anything in connection with the claim for the loss at the time of the robbery;" plaintiff had previously submitted to the bank a list of items claimed to have been lost in the robbery; witness did not include the loss claimed by plaintiff in his report of loss to the insurance company

1034

as the policy did not "cover the boxholders;" Mr. Herbert was cashier of the bank at the time of the robbery but resigned a few days afterwards; Herbert was in Houston, Texas, when he last heard from him; witness did not request him to attend the trial and had not been in communication with him; witness was not in St. Louis at the time of the robbery; at that time Mr. Seifert and Mr. Hartnett were the watchmen, but witness did not know "if there were any watchmen there when the robbery occurred;" Hartnett was the "night watchman at the time;" he was a neighborhood watchman covering several blocks in the locality where the bank was situated.

John Buck, a witness for defendant testified: That he was a police officer and knew plaintiff who lived on his "beat;" after the robbery he was at the bank for the police department taking a list of reported losses or claims; he saw plaintiff at the bank on Monday afternoon following the robbery and that he did not report any loss then but did report a loss on the following Wednesday; he saw Covington get the box for plaintiff; there was a gentleman with plaintiff "he was an appraiser or something;" after Covington got the box out "I saw the inside; there was a chamois bag tied up and a lot of papers in there, as far as I can remember. I saw that there was a large amount of jewelry, rings and loose diamonds in the bag; more loose diamonds than I ever saw, a handful or two, a double handful. There may have been rings among them, but there were a lot of loose diamonds. There were a lot of ring mountings tied on a string; these diamonds were in some kind of bag. He or Mr. Goodman opened it and then I saw this double handful of diamonds and jewelry; I also saw some papers there, but don't know what they were." On cross-examination this witness testified that it was on the afternoon of the first day after the robbery when plaintiff called at the bank with his wife that he saw Covington "bring out the box" and that he did not recall that Herbert was there but he "may have been there."

Plaintiff, in rebuttal, testified: That he did not see Covington on his visit to the bank on Monday afternoon but that it was Herbert who opened the front of his safe deposit box and stated that it was "gone;" and that he did not tell Liedbetter that he had suffered no loss in the robbery. Ida Kramer was called as a witness in rebuttal by plaintiff and testified that she was plaintiff's wife; she and plaintiff called at the bank on Monday morning following the robbery; plaintiff showed his key to Mr. Brittin, the custodian of the safe deposit department and was directed by Brittin to "another man who had a list;" plaintiff saw the "other man" and gave him his name and the man told plaintiff "your box was looted;" witness and her husband returned to the bank on Monday afternoon and went to the safe deposit department where they saw Herbert who

took plaintiff's key and opened the box and "stuck his hand in and said your box is entirely gone."

■ · I. In determining the propriety of the action of the trial court in refusing to give respondent's instruction in the nature of a demurrer to the evidence we must look primarily to the sufficiency of appellant's evidence. The evidence must be viewed in the light most favorable to appellant and he must be given the benefit of all inferences which may be fairly and reasonably drawn therefrom. The burden however was upon appellant to submit substantial evidence tending to sustain one or more of the specifications of negligence properly pleaded by him. [Bushman v. Barlow, 316 Mo. 916, 292 S. W. 1039, l. c. 1048; Williams v. Railroad Co., 257 Mo. 87, l. c. 112, 116, 165 S. W. 788; Van Raalte v. Graff, 299 Mo. 513, l. c. 526, 252 S. W. 220.] The respondent contends that appellant's testimony was "so inherently weak, unreasonable and full of contradictions that reasonable minds could not entertain different opinions as to its truthfulness." But we are of the opinion that the testimony of appellant in this case was of such a character that the trial court could not properly treat it as entitled to no credence and that the credibility and weight to be accorded appellant's testimony was for the jury to determine. Upon a careful consideration of all the evidence adduced we are of the opinion that the evidence was sufficient to require the trial court to submit the case to the jury and that the court did not err in refusing to give respondent's instruction in the nature of a demurrer to the evidence. [Clark v. Atchison Bridge Co., 324 Mo. 544, 24 S. W. (2d) 143; Gorman v. Railway Co., 325 Mo. 326, 28 S. W. (2d) 1023; Clason v. Lenz, 322 Mo. 1113, 61 S. W. (2d) 727; Steger v. Meehan (Mo.), 63 S. W. (2d) 109; Parrent v. Mobile & Ohio Ry., 334 Mo. 1202, 70 S. W. (2d) 1068; Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950.]

■ II. Appellant assigns as error the action of the trial court in giving defendant's Instruction No. 3. This instruction told the jury, in substance, that they could not find a verdict for plaintiff "unless you find and believe from a preponderance of the evidence that the plaintiff was the lawful owner of said articles of jewelry at the time of the robbery." Appellant is conceded to have been the renter of a safe deposit box leased to him by respondent bank and which he held at the time of the robbery. It is well settled by authority that where a bank, or safe deposit company, leases a safety deposit box or safe, and the lessee takes possession of the box or safe and places therein his securities or other valuables, the relation of bailee and bailor is created between the parties to the transaction as to the property so deposited. [National Safe Deposit Co. v. Stead, 250 Ill. 584, Ann. Cas. 1912B, 434; Young v. First

National Bank, 150 Tenn. 451, 40 A. L. R. 868; McDonald v. Perkins & Co., 133 Wash. 622, 40 A. L. R. 859; Morgan v. Citizens' Bank, 190 N. C. 209, 42 A. L. R. 1299; Schaefer v. Washington Safe Deposit Co., 281 Ill. 43; Trainer v. Saunders, 270 Pa. 451; Lockwood v. Manhattan Storage Co., 50 N. Y. Supp. 974; Blair v. Riley, 37 Ohio App. 513; Cussen v. Savings Bank (Cal.), 65 Pac. 1099.] In such instances the bailment is regarded as one for the mutual benefit of the bailor and bailee and the bailee, in the absence of a valid special contract to the contrary, is held to the exercise of ordinary care in the custody, preservation and care of the bailed property. [Schaefer v. Washington Safe Deposit Co., supra; Morgan v. Citizens' Bank, supra; 6 C. J., p. 1121, sec. 61.] It is a well-established principle of law, that generally speaking, a bailee is estopped to deny or dispute the title of his bailor. [Pulliam v. Burlingame, 81 Mo. 111; Oehmen v. Portmann, 153 Mo. App. 240, 133 S. W. 104; Dougherty v. Chapman, 29 Mo. App. 233; Sherwood v. Neal, 41 Mo. App. 416, 6 C. J., p. 1108, sec. 37.] There are well-recognized exceptions to the general principle just stated but neither the pleadings nor the evidence in the instant case bring the case within the purview of any of the exceptions to the general rule mentioned. In his petition herein appellant alleged that he had placed certain specified jewelry, etc., in a safe deposit box rented to him by respondent and he did not allege, nor was it necessary for him to aver, that he was the owner of the property so deposited. [Oehmen v. Portmann, 153 Mo. App. 240, l. c. 245.] In view of the principles of law previously stated, which are clearly applicable and controlling in the instant case, we hold that the trial court erred in giving defendant's Instruction No. 3 telling the jury in substance that they could not render a verdict for plaintiff unless they found that plaintiff "was the lawful owner" of the jewelry in question.

 III. Although the error committed by the court below in giving defendant's Instruction No. 3 will require us to reverse and remand this case we deem it appropriate to notice some other contentions made by the parties in reference to the course followed by the trial court in this case as the matters to be discussed may become important in the event of a retrial of the case. Appellant complains of the action of the trial court in refusing to give Instruction No. 2 as requested by him. This instruction after hypothesizing the facts in the case relative to the deposit of the property alleged to have been lost, and respondent's failure to deliver on demand, based a recovery on one of the assignments of negligence charged by appellant as follows: ". . . And if you further find and believe from the evidence that at and prior to the time of said robbery defendant left the whole of said bank and the entrance to said safe deposit vault unguarded by any watchman or other person during

the early part of said 25th day of May, 1930, if you so find, and that, thereby, the defendant, in thus failing to guard said bank and safe deposit vault, did fail to exercise ordinary care and was then and there guilty of negligence, if you do so find. . . ." Respondent contends here that there "was a total failure of proof" to sustain the assignment of negligence set forth in this instruction: "That at and prior to the time of said robbery defendant left the whole of said bank and the entrance to said safe deposit vault unguarded by any watchman or other person during the early part of said 25th day of May, 1930." But we are of the opinion that the evidence adduced, and especially the testimony of plaintiff's witness Ben Stozier hereinbefore summarized, together with the inferences which might fairly and reasonably have been drawn therefrom, was sufficient to justify the trial court in submitting to the jury the particular issue of negligence involved in this instruction and that the trial court erred in not giving the instruction as requested by appellant.

IV. Appellant further urges that the trial court erred in refusing to give Instruction A requested by him. This instruction was a very comprehensive one and sought to predicate a recovery upon a favorable finding by the jury upon five assignments of negligence. The instruction set forth by way of hypothesis certain facts which were constitutive of the cause of action but which were not charged in the petition as assignments of negligence and also certain other facts which were assumed to have been charged as assignments of negligence. All the facts hypothesized in the instruction were set forth therein conjunctively and the jury was instructed to find a verdict for plaintiff "if you find defendant was guilty of negligence in all of the respects aforesaid." We think the instruction was faulty in several particulars but we shall only notice one or two of its defects here. The instruction in assuming to set forth certain assignments of negligence failed to include all the material elements of these assignments of negligence as pleaded by plaintiff. Thus, one element of the instruction stated, hypothetically, that defendant "took down and removed from the entrance to said safe deposit vault a large steel door weighing seventeen tons . . . and put in its place and stead a brick partition with a metal door and an inner metal fire door as the sole protection against entrance into said vault." But the petition in charging this assignment of negligence averred that upon the removal of the "large steel door" the defendant put in its place "a *light* brick partition with a *thin metal door and a light fire door with easily destructible locks thereon*," and that said "*partition and said doors were of light and flimsy material and construction, and the locks thereon were insecure and easily destructible.*" We have italicized the averments in the petition which were omitted from the instruction under consideration. The

1038

instruction made omissions similar in character with reference to material elements charged in other assignments of negligence which it assumed to cover. The omission of material elements of the assignments of negligence pleaded made the instruction more comprehensive and thus broader in terms than the negligence pleaded and hence the trial court committed no error in refusing to give it. [Krelitz v. Calcaterra (Mo.), 33 S. W. (2d) 909; Best v. Liverpool, etc., Ins. Co. (Mo. App.), 49 S. W. (2d) 230; Allison v. Dittbrenner (Mo. App.), 50 S. W. (2d) 199.] We are further of the opinion that plaintiff's Instruction A was faulty in failing to discriminate between facts merely constitutive of the cause of action and other facts which were charged in the petition as assignments of negligence. In our opinion this defect in the instruction rendered it confusing and misleading.

V. Appellant further urges that the trial court erred in admitting in evidence a document described in the record herein as Defendant's Exhibit C. The record shows that this document was offered and received in evidence but as the record does not set forth the contents of the document we are of the opinion that this court cannot consider the propriety of the action of the trial court in admitting this document as evidence. [State ex rel. Malin v. Merriam, 159 Mo. 655, 60 S. W. 1112; Fruin v. O'Malley, 241 Mo. 250, 145 S. W. 137; Perringer v. Raub, 300 Mo. 535, 254 S. W. 704.]

Some other alleged errors have been called to our attention by counsel but we deem it unnecessary to discuss them.

For the reasons herein stated the case will be reversed and remanded. It is so ordered. All concur.