James W. TYLER (Plaintiff), Appellant,

v.

LINDELL TRUST COMPANY, a Corporation (Defendant), Respondent.

No. 29082.

St. Louis Court of Appeals.

Missouri.

Dec. 20, 1955.

William A. Ratican, St. Louis, for appellant.

Walther, Hecker, Walther & Barnard, St. Louis, for respondent.

MATTHES, Judge.

Plaintiff, appellant, instituted this action to recover $3,500 from defendant, respondent. Plaintiff's theory is that currency in that amount belonging to him was in a safe deposit box which he had rented from defendant, and that between October 29, 1945, and November 2, 1945, the defendant wrongfully, and without his knowledge or consent, permitted the removal of all of said currency from the box. The trial resulted in a verdict for defendant, and fol-

lowing judgment entered thereon, plaintiff has appealed to this court. We shall refer to. plaintiff, appellant, as plaintiff, and defendant, respondent, as defendant, or trust company.

Plaintiff, shown by the record to be a Negro, was 49 years old at the time of the trial in March of 1954. In support of his case plaintiff offered evidence disclosing: He rented box No. 62 from the defendant on April 4, 1943; during that year he was operating a cleaning and pressing business at 2742 Cass Avenue, St. Louis, Missouri. Between the date of renting the box and October 29, 1945, on different occasions, plaintiff placed currency in said box. On October 29th he and another Negro named Joe Gholson went to the trust company, located at Grand Boulevard and St. Louis Avenue, St. Louis, Missouri. Pursuant to requirements of the trust company, plaintiff signed the entry or admission card, and gave it and the key to John F. Peters, then a director and vice-president of defendant, who obtained the box from the vault and handed it to plaintiff. The latter took the box into a booth, placed $300 in currency therein, counted all of the bills and found there was $3,500 in the box. Thereupon the box was returned to Peters, who placed it in the vault. Plaintiff and his companion left the bank and returned to plaintiff's place of business. In the meantime a load of coal had arrived at plaintiff's cleaning establishment and the coal man was demanding payment therefor. Not having the required amount of money, plaintiff returned to the trust company for the purpose of procuring from his box enough money to pay for the coal. Again he followed the usual procedure, signed the entry card, and handed same with his key ring to Miss Edna A. Bergmann, a bank employee. The latter discovered the key to the box was not on the ring and so informed plaintiff, who immediately returned to his shop and made an unsuccessful search for the missing key. According to plaintiff's version of what took place, he did not go back to the bank until November 2nd, which fell on Friday. By that time he had the second key in his possession, having obtained two when

he rented the box, and after signing the card he obtained the box from Miss Bergmann. He took it to a booth, opened it, and discovered all of the currency gone. He immediately made a report of the missing currency to Miss Bergmann and Mr. Peters, and in a short while he called a police officer.

Defendant's evidence presented a different picture in many respects. During the year 1943 and prior thereto, one desiring to rent a box from the trust company was required to sign a written contract which contained certain provisions not necessary to mention in this opinion. That procedure was followed when plaintiff rented box No. 62. After execution of the contract a box of a certain number was designated for the use of the customer, who was given two keys therefor. And the renter could not gain admission to his box without signing an admission card, sometimes referred to as an entry slip. The bank attendant would compare the signature on the card with the signature on the rental contract, and if they were found to be the same, the card was then placed in a time clock which automatically recorded the date, year, and time of day. Then, with the key obtained from the renter, and the master key retained by the trust company, both of which had to be used in order to open the door of the compartment in which the box was retained, the attendant would obtain the box and hand the same to the renter, who was privileged to use an enclosed booth provided by the trust company while the box was in his possession.

Miss Bergmann was the vault attendant in 1945. Plaintiff had gained access to his box on twenty different occasions between January, 1945, and October 29th of the same year, and by reason of her contacts with him on his visits to her department she knew the plaintiff. According to Miss Bergmann's testimony, confirmed by the card signed by plaintiff, the latter came to her department at 12:26 p. m. on October 29th accompanied by another Negro. Upon signing the card plaintiff was given his box, and in the words of Miss Bergmann, "he asked this other colored man to ac-company him to the booth". After about ten minutes plaintiff returned and handed the box to Miss Bergmann, who returned it to its place in the vault. At that time plaintiff's gait was unsteady, and Miss Bergmann detected the odor of liquor on his breath. Another admission card was signed by plaintiff the same day at 12:46 p. m., or twenty minutes after the first card was signed. Both Miss Bergmann and Mr. Peters, who was present on the second occasion, testified that plaintiff was then intoxicated, that he had difficulty in signing his name, was unable to do so with a pen, but managed to affix his signature with a pencil provided by Mr. Peters. The box was obtained by Miss Bergmann, handed to plaintiff, who took same to a table next to a filing cabinet, and in a few minutes it was returned to Peters who inserted the box in the proper place and locked the compartment door. Again plaintiff was accompanied by Joe Gholson and although Gholson evidenced a state of insobriety, he was not as unsteady as plaintiff, and assisted the latter from the safe deposit box department. The trust company's records disclosed further that at 9:03 a. m. on the following day, October 30, 1945, an admission card bearing plaintiff's signature was stamped. In this connection Miss Bergmann testified that she saw plaintiff sign that card. She detected a slight odor on his breath, but his gait was steady. She obtained and gave the box to plaintiff, who took it to a booth where he remained five or ten minutes, after which he returned the box to Miss Bergmann who placed it in the vault. Plaintiff categorically denied being in the trust company on October 30th, and insisted the signature on the admission card was not his but a forgery.

Bearing upon the issue of whether plaintiff actually had currency amounting to $3,-500 in his box, the defendant produced evidence showing that in 1945 plaintiff was indebted for a steam pressing machine and was making payments of $28 per month on that indebtedness; that in March, 1945, plaintiff had obtained a loan from the Commercial Loan Company which he was discharging by making monthly payments

of $10 each; that he also told the police officers who made the investigation following plaintiff's report to the police department that in 1945 he owed $130 for a clothes rack, and $50 to a painter; that in 1943 plaintiff's first wife divorced him and obtained a judgment against plaintiff for $5 per week for support, which plaintiff had failed to pay. In explanation of such failure plaintiff stated his former wife refused to permit him to see their child, and he was advised not to pay her.

The lengthy report of the police officers, requiring thirteen pages in the transcript, was introduced in full and read to the jury. That report disclosed that a comparison was made by the officers of the signatures appearing on the twenty-one admission cards admittedly signed by plaintiff, with the signature on the card dated October 30, 1945, which plaintiff denied was his. In the opinion of the officers all cards were signed by the same person. However, the record also revealed that Mr. G. G. Swett, who was a Post Office Inspector in 1945, had examined the signatures on the cards, and in his opinion the signature on the card stamped October 30, 1945, 9:03 a. m. was a forgery. The officers reported further that during the course of their investigation they interviewed plaintiff on several occasions, "and each time he gave a conflicting and different statement".

At the request of defendant the court gave instructions 2, 3, and 4, which plaintiff contends did not properly declare the law of the case. Instruction 2 directed a verdict for defendant upon a finding that plaintiff did not have $3,500 in the safe deposit box on October 29, 1945, or upon a finding that plaintiff signed the entry card dated October 30, 1945, at 9:03 a. m.; instruction 3 declared the burden was upon plaintiff to prove his case by the greater weight or preponderance of the credible evidence; instruction 4 covered the credibility of the witnesses.

As we understand the points raised by plaintiff, he does not urge that instruction 2, standing alone, was prejudicially erroneous, but that it, along with instruction 3,

placed a burden upon plaintiff greater than the law imposes in a case of this kind. His precise point seems to be that upon introducing evidence that he deposited money in the box rented from defendant, and evidence that the defendant failed upon demand to return the money to plaintiff, the presumption arose that plaintiff's loss was due to the failure of the defendant to exercise the degree of care required by the nature of the bailment. In short, he contends that the rule imposing on one asserting the affirmative of an issue the burden of proving the truth thereof does not apply in a case involving a bailment of the character that arises as the result of the renting of a safe deposit box. This contention cannot be sustained.

■ The relationship existing between a bank, trust company, or safe deposit company, and one renting a safe deposit box therefrom, was set at rest in this state by the Supreme Court in Kramer v. Grand Nat. Bank, 336 Mo. 1022, 81 S.W.2d 961, loc. cit. 967, where it is said that under such circumstances the relation of bailee and bailor is created between the parties to the transaction as to the property so deposited. And in the Kramer case the court also said that such a bailment is regarded for the mutual benefit of the bailor and bailee, and that the bailee, in the absence of a special valid contract to the contrary, is held to the exercise of ordinary care in the custody, preservation, and care of the bailor's property. This rule prevails in a number of states as shown by citations appearing under annotations in 133 A.L.R., pages 283 and 284.

Apparently recognizing that the element of failure to exercise ordinary care was essential to a recovery, plaintiff, by his amended petition upon which the case was tried, charged the defendant with negligence in permitting wrongful "abstraction or misapplication of plaintiff's property from said box", and in failing to use proper safeguards as to identification resulting in the loss of plaintiff's property. And it is manifest from the record that during the trial it was plaintiff's theory that the de-

fendant was guilty of negligence in failing to exercise ordinary care in the custody and preservation of plaintiff's property in that it permitted an unauthorized person, on October 30, 1945, to forge plaintiff's name to the entry card, and in delivering the box rented by plaintiff to such person.

The general rule is that the burden of proof rests on the party who has the affirmative of the issue as determined by the pleadings, or the duty to establish the truth of a given proposition or issue. 31 C.J.S. Evidence, § 104, p. 710; 20 Am.Jur., Section 131, page 134. " 'The burden of proof, meaning the obligation to establish the truth of the claim by preponderance of the evidence, rests throughout upon the party asserting the affirmative of the issue * * *. This burden of proof never shifts during the course of the trial.' Downs v. Horton, 287 Mo. 414, 230 S.W. 103, 108." Clapper v. Lakin, 343 Mo. 710, 123 S.W.2d 27, loc. cit. 33. And with respect to actions growing out of a bailment of the character we are considering, if the renter of a box, the bailor, charges the bank or bailee with negligence, the burden of proof rests upon the bailor to prove by a preponderance of the evidence, negligence of the bailee, and the burden of proof does not shift at any time during the trial although the burden of going forward with the evidence to overcome a prima facie case may shift to the bailee. Kramer v. Grand Nat. Bank, supra; Rosendahl v. Lemhi Valley Bank, 43 Idaho 273, 251 P. 293; Roberts v. Minier, 240 Ill.App. 518; Wilson v. Citizens Cent. Bank, 56 Ohio App. 478, 11 N.E.2d 118; Bohmont v. Moore, 138 Neb. 907, 297 N.W. 559, 133 A.L.R. 270; 6 Am.Jur., Section 424, page 502.

It is apparent there was a sharp conflict in the evidence on two questions vital to a recovery by plaintiff, i. e., did plaintiff have $3,500 in the box, and if so, did the bank permit an unauthorized person to forge plaintiff's signature and thereby gain access to the box? Plaintiff, having the affirmative of those issues, was under the burden of establishing them by the preponderance of the evidence. This burden remained upon plaintiff throughout the trial. Now, after plaintiff had adduced evidence making a prima facie case, the burden of going forward with the evidence shifted to defendant, but this does not mean that the burden of proof shifted. Roberts v. Minier, 240 Ill.App. 518, loc. cit. 529.

Plaintiff makes the additional point that instruction 3 on the burden of proof was improper because "said instruction is abstract, was misleading to the jury and omits essential factual elements". There is no merit in this contention. Instruction 3 follows the pattern suggested by the Supreme Court in Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S.W.2d 58, loc. cit. 63, wherein the court condemned burden of proof instructions which attempt to state technical rules, and said, " 'A short, simple instruction, telling the jury that the burden is on plaintiff to prove his case by a preponderance or greater weight of the credible evidence, and that unless he has done so the jury must find for defendant, ought to be sufficient to inform the jury what plaintiff is required to do.' "

Plaintiff has attacked instruction No. 4 on the credibility of witnesses because the word *must* appears in that portion thereof which laid down the guide for the jury to follow in applying the rule of evidence expressed in the maxim, Falsus in uno, falsus in omnibus. By the instruction the jury was told that if it believed any witness had knowingly sworn falsely to any material fact, then "you *must* disregard such portion of the testimony as you believe to be false, if any, and you are at liberty to reject all other portions of such witness' testimony". (Italics ours.) It will be observed that the instruction submitting the Falsus in uno maxim did not require the jury to disregard the testimony of a witness, even though false, unless it was related to a material fact and was knowingly given. It is essential to the administration of justice and the preservation of our jury system that jurors disregard false testimony of a witness relating to a material issue. And our courts have never hesitated to announce that the duty is upon

the jury to disregard testimony of a witness unworthy of belief. State v. Clark, Mo. Sup., 111 S.W.2d 101; State v. Tucker, 333 Mo. 171, 62 S.W.2d 453; State v. Willard, 346 Mo. 773, 142 S.W.2d 1046; State v. Whipkey, 358 Mo. 563, 215 S.W.2d 492. We must therefore hold that plaintiff could not have been prejudiced by the form of the instruction.

For the reasons herein stated the judgment should be affirmed. It is so ordered.

ANDERSON, P. J., and SAM C. BLAIR, Special Judge, concur.